many of these activities were organized and directed across state lines, and that the problem was increasingly beyond the scope of local and state authorities. H.R. Rep. No. 103-306, at 9, U.S.C.C.A.N., at 706.

Given the detailed congressional record, we are satisfied that Congress had a rational basis to conclude that the activities prohibited by the Act disrupted the national market for abortion-related services and decreased the availability of such services. *See Gregg*, 226 F.3d at 263-64. Considered along with the other *Morrison* factors, we hold that Congress validly enacted the Act pursuant to its Commerce Clause power.

### V.

Finally, plaintiffs argue that the Act targets only anti-abortion groups and therefore violates the Equal Protection Clause. We find this argument meritless because plaintiffs do not constitute a suspect class, the Act does not infringe on plaintiffs' First Amendment rights, and Congress plainly had a rational basis in enacting the Act. *See Terry*, 101 F.3d at 1422. We agree and affirm the district court's dismissal of plaintiffs' equal protection claim.

### VI.

For the foregoing reasons, we AFFIRM the decision of the district court dismissing plaintiffs' constitutional challenges to the Act and its denial of declaratory and injunctive relief.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0257P (6th Cir.)
File Name: 02a0257p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ANNELORE B. NORTON and
LOIS GREIFFENDORF,
        *Plaintiffs-Appellants,*

        *v.*                                  No. 00-2487

JOHN ASHCROFT, et al.,
        *Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Michigan at Kalamazoo.
No. 00-00141—Gordon J. Quist, District Judge.

Argued: June 13, 2002

Decided and Filed: July 31, 2002

Before: MARTIN, Chief Circuit Judge; KEITH and
        KENNEDY, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Robert J. Muise, THOMAS MORE CENTER FOR LAW & JUSTICE, Ann Arbor, Michigan, for Appellants. Sushma Soni, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Robert J. Muise, Kimberly A.R.

Daniels, THOMAS MORE CENTER FOR LAW & JUSTICE, Ann Arbor, Michigan, for Appellants. Sushma Soni, Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

————————

**OPINION**

————————

BOYCE F. MARTIN, JR., Chief Circuit Judge. Plaintiffs Annelore B. Norton and Lois Greiffendorf, anti-abortion activists, appeal the district court's determination that (1) the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248, does not, on its face, violate plaintiffs' First Amendment rights of free speech and freedom of association; (2) plaintiffs' as-applied First Amendment challenge is not ripe for judicial review; (3) Congress validly enacted the Act pursuant to its Commerce Clause powers; and, (4) the Act does not violate plaintiffs' rights under the Equal Protection Clause. We AFFIRM.

I.

This case arises out of plaintiffs' protests at the Planned Parenthood Clinic in Kalamazoo, Michigan. Norton, a volunteer nurse, and Greiffendorf, a teacher in a Roman Catholic school, regularly picketed, prayed, handed out literature, and attempted to counsel individuals who entered the Clinic. Typically, plaintiffs stood on the public sidewalk on either side of the Clinic's driveway. Although plaintiffs claim they do not intend to block access to the Clinic, on some occasions, drivers would stop in the Clinic's driveway to take a leaflet from, or speak with, one of the plaintiffs.

Concerned about potential obstruction, Clinic employees made several complaints to state and federal law enforcement. In response, the United States Marshal for the Western District of Michigan requested Norton attend a meeting with law enforcement and Clinic employees. Norton attended the meeting on June 1, 2000, along with her attorney, John

In addition, the Senate also found that reproductive health clinics engage in interstate commerce because they "purchase medicine, medical supplies, surgical instruments and other necessary medical products, often from other States; they employ staff; they own and lease office space; they generate income." *Id.* at 31.

As to the link between the regulated activity and interstate commerce, Congress concluded that the clinic blockades and violent protests proscribed by the Act forced clinics to close, caused harmful delays in the provision of medical services, increased health risks to patients, S. Rep. No. 103-117, at 14-15 and caused millions of dollars of damage to reproductive health facilities, H.R. Rep. No. 103-306, at 7, U.S.C.C.A.N., at 704. Threats of violence also decreased physicians' willingness to perform abortions. S. Rep. No. 103-117, at 14; H.R. Rep. No. 103-306, at 8, U.S.C.C.A.N., at 705. The Senate Committee noted that the violence "has . . . taken a severe toll on providers, intimidated some into ceasing to offer abortion services, and contributed to an already acute shortage of qualified abortion providers." S. Rep. No. 103-117, at 14. For example, at least three physicians in Dallas stopped performing abortions in 1992 as a result of pressure by an anti-abortion group; two doctors in Melbourne, Florida stopped working in 1993 after receiving death threats; and, since Dr. Gunn, an abortion-provider in Florida, was shot in 1993, at least eight more doctors have stopped offering abortion services. *Id.* at 16-17. The House Committee reported similar conclusions, characterizing the provider shortage as "at least partially attributable to the violence and intimidation described in [the] report." H.R. Rep. No. 103-306, at 8, U.S.C.C.A.N. at 705. According to the record, "Doctors understandably are leaving the field, and new graduate[s] have little desire to enter the field even as part of a wider obstetrics/gynecology practice." *Id.*

In addition to the documented economic disruption of clinic blockades and violent protests, Congress also found that this conduct was driven by a nationally unified and nationally coordinated anti-abortion movement. Congress found that

*See Gregg*, 226 F.3d at 263; *Bird*, 47 F.3d at 678.  Thus, in evaluating the constitutionality of the Act we are mindful of the informed judgment of our congressional counterparts.

Finally, the fourth *Morrison* factor directs us to assess the link between the regulated activity and interstate commerce. 529 U.S. at 612.  In making this assessment of the Act, we first examine the interstate nature of the market for reproductive health services and then examine congressional findings regarding how the activity prohibited by the Act burdens interstate commerce.

With respect to this first inquiry, the legislative record indicates that there is a national market for abortion services. *See Gregg*, 226 F.3d 263-64; *Bird*, 124 F.3d at 678.  Owing to a national shortage in reproductive health services where only 17% of counties have an abortion provider, H.R. Rep. No. 103-306, at 8, U.S.C.C.A.N., at 705, patients must often travel interstate to obtain reproductive health services.  S. Rep. No. 103-117, at 31; H.R. Rep. No. 103-603, at 10, U.S.C.C.A.N., at 707.  For example, the Senate found that 44% of patients treated at a Wichita, Kansas clinic were from out of state.  S. Rep. No. 103-117, at 31.  According to the congressional record, this shortage is particularly severe in rural counties because most abortion providers are located in metropolitan areas.  H.R. Rep. No. 103-306, at 8, U.S.C.C.A.N., at 705.  Moreover, abortion opponents are particularly likely to target rural reproductive health service providers because elimination of such a provider can eliminate abortion services for all women in a geographic area. *Id.*

As a consequence of this national shortage in reproductive health providers, physicians must also engage in interstate commerce. The Senate noted that physicians travel interstate and that some physicians perform abortion-related services in more than one state.  S. Rep. No. 103-117, at 31.  For example, the Senate noted that one physician from Minnesota provided abortion services in Minnesota, Montana, North Dakota, and parts of Canada. *Id.* at n. 46.

Lohrster.  At the meeting, federal agents discussed Norton's activity in handing out leaflets and speaking with individuals in cars stopped in the Clinic driveway.  The agents advised Norton that she was causing drivers to stop in the driveway, thereby impeding access to the Clinic.  Gerry Alexander, a Federal Bureau of Investigation agent, informed Norton they were concerned about a "pattern of activity" and that such a pattern could be considered a violation of the Freedom of Access to Clinic Entrances Act.  The agents also informed Norton that she would not risk prosecution if she picketed, prayed and counseled across the street from the Clinic.

In a letter dated June 2, 2000, the government advised the plaintiffs that "they will need to communicate with individuals visiting the clinic at some other point – either across the street or at some other area where they are not blocking access to the clinic." Although Greiffendorf did not attend the meeting, she claims that after reading the June 2 letter, she did not resume her counseling and protesting activities outside the Clinic because she feared arrest.

Norton was not as easily dissuaded.  On or about June 19, 2000, Norton returned to the Clinic  and prayed on the sidewalk.  She did, however, attempt to stay approximately thirty feet from the driveway, so as to avoid stopping cars. Notwithstanding the Clinic sign cautioning "For Traffic Safety Do Not Stop In Drive, Persons Outside Gate Are Not Employees of Planned Parenthood" and Norton's distance from the Clinic driveway, a car stopped in the driveway and called out to Norton.  At the same time, a Clinic employee drove up behind the stopped car and began honking her horn. Concerned about arrest, Norton signaled to the first driver to move across the street.  Apparently on the same day, an individual who Norton recognized as a Clinic employee, motioned for Norton to approach her car.   Fearing entrapment, Norton turned and walked away from the car. Following these incidents, Norton left the Clinic and has not returned.

After a series of letters between counsel, plaintiffs filed suit against the Attorney General, the United States Attorney for the Western District of Michigan, United States Marshal Barbara C. Lee, and FBI Agent Gerry Alexander, in their official capacity, challenging the constitutionality of the Act, and seeking declaratory and injunctive relief. After briefing and a hearing, the district court dismissed plaintiffs' seven-count complaint. Relying on the unanimous precedent of those circuits that have considered the issue, the district court dismissed plaintiffs' facial challenges to the Act. The district court declined to reach the substance of plaintiffs' as-applied challenge, finding such claims unripe for review; and, in the alternative, declined to exercise its discretion to grant declaratory relief under the Declaratory Judgment Act. The district court denied plaintiffs' request for injunctive relief.

## II.

This court reviews a district court's dismissal of a complaint *de novo. Moore v. City of Harriman*, 272 F.3d 769, 771 (6th Cir. 2001) (en banc).

All of our sister circuits to address First Amendment facial challenges to the Act have upheld the Act. *United States v. Gregg*, 226 F.3d 253, 267 (3d Cir. 2000), *cert. denied*, 532 U.S. 971 (2001); *United States v. Weslin*, 156 F.3d 292, 297 (2d Cir. 1998), *cert. denied*, 525 U.S. 1071 (1999), *United States v. Bird*, 124 F.3d 667, 683-84 (5th Cir. 1997), *cert. denied*, 523 U.S. 1006 (1998); *Terry v. Reno*, 101 F.3d 1412, 1418-1421 (D.C. Cir. 1996), *cert. denied*, 520 U.S. 1264 (1997); *United States v. Soderna*, 82 F.3d 1370, 1374-77 (7th Cir.), *cert. denied*, 519 U.S. 1006 (1996); *United States v. Dinwiddie*, 76 F.3d 913, 921-24 (8th Cir.), *cert. denied*, 519 U.S. 1043 (1996); *Cheffer v. Reno*, 55 F.3d 1517, 1521-22 (11th Cir. 1995); *American Life League, Inc. v. Reno*, 47 F.3d 642, 648-52 (4th Cir.), *cert. denied*, 516 U.S. 809 (1995). Finding their analyses persuasive, we join this uniform line of decisions and hold that the Act does not, on its face, violate the First Amendment.

*Lopez*, 514 U.S. at 562 (stating the act contained "no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce."). By the same measure, a jurisdictional element does not guarantee that a particular enactment will pass muster. *See Corp*, 236 F.3d at 331. In light of the extensive congressional findings regarding the economically disruptive effects of clinic blockades and anti-abortion violence, we find that a formal jurisdictional element is unnecessary because the proscribed activity targets "reproductive health clinics that are, by definition, directly engaged in the business of providing reproductive health services." *Gregg*, 226 F.3d at 263; *see also Bird*, 124 F.3d at 678 ("Consistent with *Lopez*'s admonition, we note that the presence of a national commercial market in abortion-related services, together with the effects on such market of the proscribed conduct, serves as a limiting principle circumscribing Congress's regulation of intrastate activity under the Act."); *Terry*, 101 F.3d at 1418 ("*Lopez*'s fundamental proposition is that Congress must ensure that its Commerce Clause power to regulate noncommercial activities extends to only those activities that substantially affect interstate commerce. Congress may do so either through its own legislative findings or by including a jurisdictional element in the statute; it need not do both.").

*Morrison* also instructs us to consider any congressional findings that a particular activity burdens interstate commerce. 529 U.S. at 612. Of course, the constitutionality of a particular enactment is "ultimately a judicial rather than a legislative question," *Lopez*, 514 U.S. at 557 n.2 (quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 273, 85 S.Ct. 348, 13 L.E.2d 258 (1964) (Black, J., concurring)), but such findings may "enable us to evaluate the legislative judgment that the activity in question substantially affect[s] interstate commerce." *Morrison*, 529 U.S. at 612 (citation omitted). Both the Senate Judiciary Committee and the House Committee on Labor and Human Resources submitted extensive reports detailing that clinic blockades and violent anti-abortion protests burdened interstate commerce.

obtaining and providing reproductive health services" – that has a direct economic effect. *Id.* at 262. Express congressional findings underlying the Act plainly demonstrate that violent and obstructive acts directed at reproductive health facilities resulted in millions of dollars in damage, forced reproductive health clinics to close, delayed medical services, and intimidated numerous physicians from offering abortion services. S. Rep. No. 103-117, at 14 (1993); H.R. Rep. No. 101-306, at 7 (1993), *reprinted in* 1994 U.S.C.C.A.N, 699, 704. While the activity prohibited by the Act might be motivated by non-commercial sentiment – namely, staunch moral opposition to abortion – the effect of this activity is unambiguously and directly economic. Thus, in our view, such conduct is properly considered commercial activity. *See Gregg*, 226 F.3d at 262 (ruling that the Act prohibits commercial activity); *Hoffman*, 126 F.3d at 587 (noting that the regulated activity is "closely connected with, and has a direct and profound effect on, the interstate commercial market in reproductive health care services."); *Dinwiddie*, 76 F.3d at 921 ("FACE prohibits interference with a commercial activity – the provision and receipt of reproductive health services."); *Cheffer*, 55 F.3d at 1520 ("[T]he Access Act does regulate commercial activity, the provision of reproductive health services."). And as our sister circuits have ruled, Congress can properly counter such conduct with legislation pursuant to the Commerce Clause.

The Act, which was enacted prior to the Supreme Court's decisions in *Lopez* and *Morrison*, does not contain a formal jurisdictional element, *see Gregg*, 226 F.3d at 263, "a clause that purports to ensure that the law only covers activity that has a substantial effect on interstate commerce." *Corp*, 236 F.3d at 330 (quoting *United States v. Rodia*, 194 F.3d 465, 468 (3d Cir. 1999)). Although plaintiffs place considerable emphasis on this element, neither *Morrison* nor *Lopez* held that a congressional enactment would fail deferential Commerce Clause review without a formal jurisdictional element. Rather, a jurisdictional element "may establish that the enactment is in pursuance of Congress' regulation of interstate commerce." *Morrison*, 529 U.S. at 612; *see also*

### A.

Plaintiffs argue that the Act only restricts the speech of abortion opponents, and is therefore a content-based restriction. A statute that regulates speech or conduct "based on hostility – or favoritism – toward the underlying message expressed" is content-based. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). The Act, however, does not directly apply to speech, but rather prohibits three types of conduct – use of force, threat of force, and physical obstruction[1] – which are not protected by the First Amendment. *See Wisconsin v. Mitchell*, 508 U.S. 476, 484, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993) ("[A] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment."); *Cameron v. Johnson*, 390 U.S. 611, 615-17, 88 S.Ct. 1335, 20 L.E.2d 182 (1968) (rejecting First Amendment challenge to a law that prohibited obstructing access to a courthouse). Yet we recognize the Act "might incidentally affect some conduct with protected expressive elements, such as peaceful but obstructive picketing." *See American Life League*, 47 F.3d at 648; *see also Weslin*, 156 F.3d at 297.

To the extent the Act implicates protected expression, we find that it does so in a content-neutral manner. The Act prohibits interference with a variety of "reproductive health services," including all "medical, surgical, counseling or referral services relating to the human reproductive system." 18 U.S.C. § 248(e)(5) (2002). Thus, the Act prohibits interference with not only abortion-related services, it also prohibits interference with counseling regarding abortion

---

[1] In relevant part, the Act provides that "Whoever (1) by force or threat of force or by physical obstruction, intentionally injures, intimidates, or interferes with or attempts to injure, intimidate, or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services . . . shall be subject to the . . . civil remedies provided in subsection (c)." 18 U.S.C. § 248(a) (2002).

alternatives. *See Terry*, 101 F.3d at 1419. Moreover, the Act applies to anyone who violates its terms, regardless of ideology or message. *See Weslin*, 156 F.3d at 297. Indeed, the Act has been applied to at least one pro-choice protestor who threatened workers at an anti-abortion facility. *See United States v. Mathison*, Crim. No. 95-085-FVS (E.D. Wash. 1995). As the Eighth Circuit noted, the Act "would prohibit striking employees from obstructing access to a clinic in order to stop women from getting abortions, even if the workers were carrying signs that said, 'We are underpaid!' rather than 'Abortion is wrong!'" *Dinwiddie*, 76 F.3d at 923. That most of the individuals who are prosecuted under the Act are abortion opponents is irrelevant because there is no disparate impact theory under the First Amendment. *Soderna*, 82 F.3d at 1376 ("A group cannot obtain constitutional immunity from prosecution by violating a statute more frequently than any other group.").

As a content-neutral restriction, the Act must withstand intermediate scrutiny. *Gregg*, 226 F.3d at 268. A statute passes intermediate scrutiny "[1] if it furthers an important or substantial government interest; [2] if the governmental interest is unrelated to the suppression of free expression; and [3] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.E.2d 672 (1968). Initially, the Act, at a minimum, furthers an important government interest in ensuring access to reproductive health services, an interest unrelated to any incidental suppression of free expression. *See Dinwiddie*, 76 F.3d at 924. The Act only "forbids physical interference with people going about their own lawful private business," *id.*, and both specifically exempts protected First Amendment activity and leaves open "ample alternative means for communication," *Terry*, 101 F.3d at 1420. Therefore, we are satisfied that the Act easily passes muster under *O'Brien*.

All eight circuits to address the issue have held that Congress validly enacted the Act pursuant to its Commerce Clause authority. *Gregg*, 226 F.3d at 262-63; *Weslin*, 156 F.3d at 296; *Hoffman v. Hunt*, 126 F.3d 575, 582-88 (4th Cir. 1997); *Bird*, 124 F.3d at 672-82; *Terry*, 101 F.3d at 1415-18; *Soderna*, 82 F.3d at 1373-74; *Dinwiddie*, 76 F.3d at 920; *Cheffer*, 55 F.3d at 1519-21. Nevertheless, plaintiffs contend that the Supreme Court's recent invalidation of the Violence Against Women Act's civil remedy provision requires reversal of the district court's decision that the Act was validly enacted pursuant to Article I, Section 8. *See Morrison*, 529 U.S. at 613. In particular, plaintiffs contend that *Morrison* calls into question the uniform body of pre-*Morrison* caselaw upholding the Act, and that the Act does not pass muster under *Morrison*'s four-factor test.

At the outset, we reject plaintiffs' initial contention that *Morrison* calls into question the uniform body of cases upholding the Act against Commerce Clause challenges. Rather than breaking new Commerce Clause ground, *Morrison* derived its four-factor framework directly from *Lopez*. *Id.* at 609 ("Since *Lopez* most recently canvassed and clarified our case law governing this third category of Commerce Clause regulation, it provides the proper framework for conducting the required analysis of [the civil remedy provision of the Violence Against Women Act].");*see also Faase*, 265 F.3d at 482 (characterizing *Morrison* as elaborating upon *Lopez*); *United States v. Corp*, 236 F.3d 325, 331-33 (6th Cir. 2001) (applying four-part *Lopez* test in light of *Morrison*).

We are also satisfied that the Act withstands scrutiny under *Morrison*. In particular, we find the Third Circuit's application of the *Lopez/Morrison* four-factor test and its examination of the Act's extensive congressional findings persuasive. *See Gregg*, 226 F.3d at 261-67. Initially, we find that the Act, unlike the Violence Against Women Act's civil remedy provision, regulates activity – "the physical obstruction and destruction of reproductive health clinics and the intentional interference and intimidation of persons

the litigant must show that "it has suffered a concrete, redressable injury, that it has a close relation with the third party, and that there exists some hindrance to the third party's ability to protect his or her own interests." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 289 n.6 (6th Cir. 1998). Plaintiffs do not allege any facts regarding their allegedly close relation with these third parties or the existence of some impediment to the ability of these third parties to protect their rights. Therefore, we find that plaintiffs lack standing to assert the rights of third-party Clinic patients or prospective patients.

## IV.

"Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); *see also United States v. Faase*, 265 F.3d 475, 481 (6th Cir. 2001) ("[W]e may only invalidate a congressional enactment passed pursuant to the Commerce Clause if it bears no rational relation to interstate commerce."). The Commerce Clause empowers Congress to "regulate Commerce . . . among the several states." U.S. Const., Art. I, § 8, cl. 3. It permits Congress to regulate three categories of conduct: 1) "the use of the channels of interstate commerce"; 2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and 3) "activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558-59, 115 S.Ct. 1624, 131 L.E.2d 626 (1995). In *Morrison*, which involved this third category of regulation, the Court identified four relevant considerations: 1) the economic nature of the activity; 2) a jurisdictional element limiting the reach of the law to a discrete set of activities that has an explicit connection with, or effect on, interstate commerce; 3) express congressional findings regarding the regulated activity's effects on interstate commerce; and (4) the link between the regulated activity and interstate commerce. 529 U.S. at 610-12.

### B.

Plaintiffs also contend that the Act is impermissibly vague. A statute is unconstitutionally vague if it does not give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Every circuit court to address this challenge has ruled that the Act is not impermissibly vague. *Bird*, 124 F.3d at 684; *Terry*, 101 F.3d at 1421; *Soderna*, 82 F.3d at 1376-77; *Dinwiddie*, 76 F.3d at 924; *Cheffer*, 55 F.3d at 1521-22; *American Life League*, 47 F.3d at 653. We agree.

Relatedly, plaintiffs also mount an overbreadth challenge to the Act. A statute is overbroad only if "it reaches a substantial number of impermissible applications." *New York v. Ferber*, 458 U.S 747, 771, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); *see also Deja Vu of Nashville, Inc. v. Met. Gov't of Nashville*, 274 F.3d 377, 387 (6th Cir. 2001). The Act prohibits only a limited range of conduct – the use or threat of force, or non-violent physical obstruction, intended to prevent access to, or the provision of, reproductive services. *See Terry*, 101 F.3d at 1421. Contrary to plaintiffs' assertion, the Act does not apply to "any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution." 18 U.S.C. § 248(d)(1) (2002). Therefore, we conclude the Act is not impermissibly overbroad.

### III.

### A.

The district court dismissed plaintiffs' as-applied challenge pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction. A court lacks jurisdiction over the subject matter if the claim is not yet ripe for judicial review. *Bigelow v. Michigan Dep't of Natural Res.*, 970 F.2d 154, 160 (6th Cir. 1992). Ripeness doctrine exists "to ensure that courts decide only existing, substantial controversies, not hypothetical questions or possibilities." *Deja Vu*, 274 F.3d at 399 (quoting

*Dixie Fuel Co. v. Comm'r of Soc. Sec.*, 171 F.3d 1052, 1057 (6th Cir. 1999)). In order to determine whether a claim is ripe, this court examines (1) the likelihood that the harm alleged will ever come to pass; (2) whether the factual record is sufficiently developed to allow for adjudication; and, (3) hardship to the parties if judicial review is denied. *Adult Video Ass'n v. United States*, 71 F.3d 563, 568 (6th Cir. 1995). For pre-enforcement challenges, a case is ordinarily ripe for review "only if the probability of the future event occurring is substantial and of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Nat'l Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 284 (6th Cir. 1997) (citations and internal punctuation omitted). In a First Amendment pre-enforcement challenge, the inquiry usually focuses on how imminent the threat of prosecution is and whether the plaintiff has sufficiently alleged an intention to refuse to comply with the statute. *Id.* at 285. Although the ripeness requirement is somewhat relaxed in the First Amendment context, there nonetheless must be a credible fear of enforcement. *Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 479 (2d Cir. 1999).

Given these guidelines, we find that plaintiffs' as-applied challenge is not yet ripe for review. First, assuming plaintiffs have sufficiently alleged unconstitutional harm, they have not established that such alleged harm will ever come to pass. In the June 1, 2000, meeting the government indicated that it was concerned about a "pattern of activity." Plaintiffs have not, however, engaged in such a "pattern of activity." While in certain circumstances, an unequivocal intention to engage in such a "pattern of activity" might suffice for ripeness purposes, the Act is a specific intent statute. Accordingly, application of the Act depends not only on the existence of such a "pattern of activity," but on specific facts demonstrating that plaintiffs acted with the requisite specific intent. In the present case, this inquiry is further complicated by the fact that plaintiffs have professed an intention to comply with the Act. Under these circumstances, we cannot conclude that plaintiffs have sufficiently demonstrated that the alleged harm will ever come to pass.

Along the same lines, plaintiffs cannot show that the current factual record is sufficiently developed to permit review. As noted above, the government indicated that it might consider a "pattern of activity" to be a violation of the Act. But plaintiffs have not engaged in such a pattern, and without a concrete set of facts, we would be forced to speculate regarding the specific components of a "pattern of activity" and the likelihood that the Act might be applied to them. Under these circumstances, it would be impossible to evaluate plaintiffs' claim that the Act, as applied to them, violates the First Amendment.

Finally, withholding judicial relief does not result in undue hardship to the plaintiffs. Although plaintiffs claim they were intimidated from resuming their counseling, picketing, and praying activities at the Clinic, the meeting did not deter Norton, who resumed counseling on June 19. Even accepting plaintiffs' professed uncertainty about counseling on the section of the sidewalk immediately adjacent to the Clinic, some uncertainty inheres in conduct – even conduct motivated only by the strongest moral convictions – along "the boundaries of the criminal law." *Adult Video Ass'n*, 71 F.3d at 568. Such uncertainty does not rise to the level of undue hardship. *Id.* Notably, if plaintiffs wish to avoid this uncertainty, they can heed the government's advice and simply move their counseling activities across the street from the Clinic.

In light of the foregoing, we hold that the district court correctly concluded that plaintiffs' as-applied challenge is not ripe for review and properly dismissed their challenge for lack of subject matter jurisdiction.

B.

In a footnote, plaintiffs assert that they have standing to assert the First Amendment rights of individuals entering the Clinic who may wish to speak with them. Ordinarily, a party does not have standing to assert the rights of third parties. *In re Troutman Enterp., Inc.* (*Harker v. Troutman*), 286 F.3d 359, 364 (6th Cir. 2002). In order to avoid this general rule,