*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name:  07a0431p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

No. 06-5380
TIMOTHY MORRISON et al.,
                                 *Plaintiffs-Appellants,*

          *v.*

BOARD OF EDUCATION OF BOYD COUNTY et al.,
                                 *Defendants-Appellees.*


Nos. 06-5406/5407
TIMOTHY MORRISON et al.,
                    *Plaintiffs-Appellants (06-5406)/*
                                 *Cross-Appellees,*


          *v.*


BOARD OF EDUCATION OF BOYD COUNTY,
                                 *Defendant-Appellee,*

WILLIAM CARTER et al.,
          *Intervenors-Defendants-Appellees/*
               *Cross-Appellants (06-5407).*

Nos. 06-5380/5406/5407

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 05-00038—David L. Bunning, District Judge.

Argued:  July 25, 2007

Decided and Filed:  October 26, 2007

Before:  MOORE and COOK, Circuit Judges; ADAMS, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Joel L. Oster, ALLIANCE DEFENSE FUND, Leawood, Kansas, for Plaintiffs.  Sharon McGowan, AMERICAN CIVIL LIBERTIES UNION, New York, New York, Winter R. Huff, LAW

---

[*] The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

OFFICES OF JOHN G. PRATHER, Somerset, Kentucky, for Defendants.  **ON BRIEF:**  Joel L. Oster, Kevin H. Theriot, ALLIANCE DEFENSE FUND, Leawood, Kansas, Benjamin W. Bull, Gary McCaleb, ALLIANCE DEFENSE FUND, Scottsdale, Arizona, for Plaintiffs.  Sharon McGowan, Kenneth Y. Choe, AMERICAN CIVIL LIBERTIES UNION, New York, New York, Winter R. Huff, LAW OFFICES OF JOHN G. PRATHER, Somerset, Kentucky, Kimberly S. McCann, VAN ANTWERP, MONGE, JONES & EDWARDS, Ashland, Kentucky, David A. Friedman, FERNANDEZ, FRIEDMAN, HAYNES & KOHN, Louisville, Kentucky, for Defendants.

MOORE, J., delivered the opinion of the court, in which ADAMS, D. J., joined.  COOK, J. (p. 12), delivered a separate dissenting opinion.

—————————

**OPINION**

—————————

KAREN NELSON MOORE, Circuit Judge.  Timothy Morrison ("Morrison") was a student at Boyd County High School ("BCHS").  He is a Christian, and he believes that homosexuality is a sin.  He further believes that part of his responsibility as a Christian is to tell others when their conduct does not comport with his understanding of Christian morality.  During the 2004-05 academic year, BCHS had a written policy prohibiting students from making stigmatizing or insulting comments regarding another student's sexual orientation.  Morrison did not want to be punished, so he kept to himself his beliefs regarding homosexuality.

After Morrison filed this lawsuit, the Board of Education of Boyd County ("Board") changed the BCHS policy, but the litigation did not end.  We must now decide whether Morrison's claim for nominal damages premised upon the "chill" on Morrison's speech during the 2004-05 school year presents a justiciable controversy.  We conclude that it does and accordingly **REVERSE** the district court's grant of summary judgment to the school board on this claim.  Because genuine issues of material fact prevent us from determining the merits of Morrison's free-speech claim, we **REMAND** the case to the district court for further proceedings.

## I. BACKGROUND

### A.  Factual Background

In 2002, some students at Boyd County High School ("BCHS") petitioned to start a chapter of the Gay Straight Alliance ("GSA").  *Boyd County High Sch. Gay Straight Alliance v. Bd. of Educ. of Boyd County*, 258 F. Supp. 2d 667, 670 (E.D. Ky. 2003).  Their efforts were met with hostility, which was not very surprising given BCHS students' history of intolerance toward homosexuality. *Id.* at 670-74.  To quell the hostility, within two months of approving the GSA, the school banned the GSA, as well as purported to ban all other student organizations for the 2002-03 school year. *Id.* at 675.

In response, a group of students who had attempted to spearhead the GSA chapter and their parents sued the school district in federal court.  After the district court issued a preliminary injunction requiring the school board to give the GSA chapter equal access to that afforded other student groups, *id.* at 693, the suit ended in a consent decree. One provision in the consent decree required the school district to adopt policies prohibiting harassment on the basis of actual or perceived sexual orientation, and to provide mandatory anti-harassment training to all students.

Prior to the 2004-05 school year, in attempting to comply with the consent decree, the school district adopted Policy 09.42811 as the district-wide anti-harassment policy. Policy 09.42811 prohibited "Harassment/ Discrimination," which it defined as

> unlawful behavior based on race, color, national origin, age, religion, sex[,] actual or perceived sexual orientation or gender identity, or disability that is sufficiently severe, pervasive, or objectively offensive that it adversely affects a student's education or creates a hostile or abusive educational environment.

> The provisions in this policy shall not be interpreted as applying to speech otherwise protected under the state or federal constitutions where the speech does not otherwise materially or substantially disrupt the educational process . . . .

Joint Appendix ("J.A.") at 120. BCHS's 2004-05 Code of Conduct repeated the first paragraph of Policy 09.42811, J.A. at 270 (BCHS Code at 3) but later stated:

> Harassment/discrimination is intimidation by threats of or actual physical violence; the creation by whatever means, of a climate of hostility or intimidation, or the use of language, conduct, or symbols in such manner as to be commonly understood to convey hatred, contempt, or prejudice or to have the effect of insulting or stigmatizing an individual.

J.A. at 277 (BCHS Code at 16).

Additionally, the school district created two training videos—one for Boyd County Middle School ("BCMS") and one for BCHS—to fulfill the anti-harassment training provisions of the consent decree. As relevant here, the high school training video included a lengthy discussion of the ills of bullying and name-calling. The participants included a BCHS social studies teacher,[1] some students, an "ADL Facilitator,"[2] and a clinical psychologist. Additionally, the BCHS training video contained a passage discussing sexual orientation. Near the end of this passage, the clinical psychologist stated,

> . . . . We all get self-centered and start to think that our way is the right way and our way is the correct way. We all want to believe that we have evidence that our way is the correct way. . . .

> So . . . no matter where you go, no matter what you do, no matter who you meet, you are going to find people that you don't like. You're going to find people that you disagree with. You're going to find people that you don't like the way they act. It can't be avoided, not, not anywhere in the world, it can't be avoided. You're going to find people that you believe are absolutely wrong. You're going to think[, W]hat are they thinking? That, that is so wrong, it[']s obvious to everybody[." B]ut not to them. Because they believe you are wrong. You can't avoid meeting people that you believe are wrong. But here is the kicker, just because you believe, just because you don't like them, just because you disagree with them, just because you believe they are wrong, whole heartedly, absolutely, they are wrong. *Just because you believe that does not give you permission to say anything*

---

[1] This teacher was also the "compliance coordinator" under the consent decree.

[2] Although the record is unclear, it appears that "ADL" stands for "Anti-Defamation League."

*about it.* It doesn't require that you do anything. You just respect, you just exist, you continue, you leave it alone. *There is not permission for you to point it out to them.*

J.A. at 229 (BCHS Training Video Tr. at 29) (emphasis added).

The new policies and the mandatory training sparked further acrimony in Boyd County. This time, some parents feared that the training would discourage, and the policies would prohibit, their children from speaking about their religious beliefs regarding homosexuality. Some parents withheld their children from the mandatory training. Eventually, a group of parents and students sued.

## B. Procedural Background

On February 15, 2005, a group of plaintiffs[3] filed their complaint in the United States District Court for the Eastern District of Kentucky. They named the Boyd County Board of Education ("Board") as the sole defendant and pursued claims under 42 U.S.C. § 1983 for violations of various constitutional rights, specifically, their rights to free speech (styled as the "FIRST CAUSE OF ACTION"), due process (second cause of action), equal protection (third cause of action), and free exercise of religion (fourth cause of action). The crux of the plaintiffs' complaint is that the speech codes in effect during the 2004-05 school year prevented students in Boyd County from speaking their convictions that homosexuality is sinful, and the speech codes and training together undermined their ability to practice their Christian faith. For these asserted violations, the plaintiffs sought declaratory relief, injunctive relief, actual damages, nominal damages, costs, and attorney fees.

On April 18, 2005, the district court permitted the plaintiffs from the earlier action to intervene. The intervenors filed their Answer in Intervention that day, denying that the plaintiffs had suffered any constitutional violations.[4]

In August 2005, the Board revised its policy, as well as the BCMS and BCHS student codes of conduct. Under the revised codes, anti-homosexual speech would not be prohibited unless it was "sufficiently severe or pervasive that it adversely affects a student's education or creates a climate of hostility or intimidation for that student, both from the perspective of an objective educator and from the perspective of the student at whom the harassment is directed." J.A. at 655 (2005-06 BCHS Code of Conduct at 40); *accord* J.A. at 642 (2005-06 BCMS Discipline Code at 16). Additionally, the BCHS Code of Conduct stated, "The civil exchange of opinions or debate does not constitute harassment. Students may not, however, engage in behavior that interferes with the rights of another student or materially and substantially disrupts the educational process." J.A. at 655 (2005-06 BCHS Code of Conduct at 40).

After these revisions, the parties filed cross-motions for summary judgment. On February 17, 2006, the district court issued its opinion and judgment granting the Board's motion and denying both the plaintiffs' and the intervenors' motions. Noting the changes that had been made to the

---

[3] The only plaintiff whose claim is relevant at this point of the litigation is Timothy Allen Morrison II ("Morrison"). At the time the complaint was filed, Morrison was a student at BCHS. The other plaintiffs are his parents Timothy and Mary Morrison, Brian Nolen, and Debora Jones. Both Nolen and Jones are parents of students who attended Boyd County Middle School at some time relevant to this case.

[4] Later, the intervenors changed their position and argued that the 2004-05 BCHS speech code was unconstitutional.

policies that were initially challenged, the district court indicated that it was "not inclined to adjudge the constitutionality of policies no longer in effect," and rejected all of the Plaintiffs' challenges to the written policies on this basis. J.A. at 672 (Dist. Ct. Mem. Op. at 7). Additionally, the district court determined that the Plaintiffs' claim for damages failed because "Plaintiffs were unable to specify the measure and amount of their alleged damages." J.A. at 680 (Dist. Ct. Mem. Op. at 15). The district court further stated that "even their request for nominal damages remains unsupported by any factual allegations," and that "Plaintiffs have made no specific plea" for damages incurred prior to the Board's change in policies. *Id.*

After the district court entered a corrected judgment for reasons not relevant to this appeal, both the plaintiffs and the intervenors timely appealed.

## II. JURISDICTION

The district court had federal-question jurisdiction over this 42 U.S.C. § 1983 action. 28 U.S.C. § 1331. We have jurisdiction over the plaintiffs' appeal from an adverse final judgment. *Id.* § 1291.

## III. ANALYSIS

Our initial task is to determine exactly which claims are, and which are not, presented in this appeal. First, the plaintiffs do not challenge the district court's rejection of their free-exercise claim, which we accordingly do not consider. Next, the district court concluded that once the school district had revised its policy in a fashion acceptable to the plaintiffs and intervenors, the plaintiffs' claims seeking forward-looking relief, i.e., declaratory and injunctive relief, became moot. The plaintiffs do not challenge this conclusion on appeal, so we do not consider their claims seeking such relief.

The plaintiffs, however, also pursued claims for damages, both nominal and compensatory. On appeal, the plaintiffs pursue only their claim for nominal damages and seek to premise this claim on Timothy Morrison's (the BCHS student plaintiff's) "chilled" speech during the 2004-05 school year. Consequently, the only plaintiff who may have a live claim is Timothy Morrison. Accordingly, Morrison's free-speech claim seeking nominal damages is the only claim that we consider on appeal.[5]

### A. Justiciability

#### 1. Mootness

The district court concluded that, because the school district had changed its policy, the case was moot, notwithstanding Morrison's claim for nominal damages. It offered two reasons for this analysis: First, the district court said that the plaintiffs had never requested nominal damages specifically for the period preceding the Board's amendment of the offending policies. Second, the

---

[5] The plaintiffs' briefs also press their equal-protection and due-process claims, but the arguments offered in support of their equal-protection theory are wholly duplicative of their free-speech arguments. The plaintiffs' due-process theory—that the 2004-05 speech code was unconstitutionally vague—similarly presents a First Amendment argument under a different label. Indeed, the primary case that the plaintiffs' brief cites in support of their due-process argument, *Sypniewski v. Warren Hills Regional Board of Education*, 307 F.3d 243 (3d Cir. 2002), analyzed the plaintiff's void-for-vagueness theory as a First Amendment argument. *Id.* at 266-67. Because the plaintiffs' due-process and equal-protection arguments are essentially First Amendment arguments masquerading as Fourteenth Amendment arguments, we do not address them separately.

district court said that the plaintiffs failed to substantiate the nominal-damages claim with factual allegations.

We believe that the first reason is inaccurate, as the complaint clearly requests "an award of actual and nominal damages in an amount deemed appropriate by" the district court. J.A. at 34 (Compl. at 14, ¶ d.). Because the offending policy was in effect when the plaintiffs filed their complaint, their request for nominal damages could have addressed only the period preceding the Board's amendment.

The district court's second reason misapprehends the nature of nominal damages. Nominal damages are awarded when there is no proof of an actual injury. *Carey v. Piphus*, 435 U.S. 247, 266-67 (1978) (holding that district court has power to award nominal damages for a denial of procedural due process when there is no proof of actual injury). As one of our out-of-circuit colleagues recently recognized, nominal damages "do not purport to compensate for past wrongs. They are symbolic only." *Utah Animal Rights Coal. v. Salt Lake City Coal.*, 371 F.3d 1248, 1264 (10th Cir. 2004) (McConnell, J., concurring). We have similarly recognized that nominal damages are appropriate when a plaintiff proves a constitutional violation but lacks proof of an actual injury. *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1352 (6th Cir. 1992) (procedural due-process claim; citing *Carey v. Piphus*).

Moreover, because nominal damages are a symbolic remedy for past wrongs, a prayer for nominal damages precludes a finding of mootness, even when the defendant has altered or abandoned the allegedly unconstitutional policy forming the basis for the plaintiff's complaint. *Murray v. Bd. of Trs., Univ. of Louisville*, 659 F.2d 77, 79 (6th Cir. 1981) (remanding First Amendment case to district court for adjudication of plaintiff's nominal-damage claim); *see also Blau v. Ft. Thomas Pub. Sch. Dist.*, 401 F.3d 381, 387 (6th Cir. 2005) ("[T]he existence of a damages claim ensures that this dispute is a live one . . . ."); *id.* at 387-88 (citing cases); *Lynch v. Leis*, 382 F.3d 642, 646 n.2 (6th Cir. 2004) ("[A] claim for nominal damages . . . is normally sufficient to establish standing, defeat mootness, and grant prevailing party status . . . ."); *Utah Animal Rights Coal.*, 371 F.3d at 1257-58 (following Tenth Circuit precedent holding that claim for nominal damages is sufficient for justiciability); *id.* at 1268 (McConnell, J., concurring) (noting that the Sixth Circuit as well as the Ninth Circuit holds that a nominal-damages claim precludes mootness, but disagreeing with the rule); *id.* at 1275 (Henry, J., concurring) ("[T]he Supreme Court has directly and indirectly indicated that a claim for nominal damages in a constitutional case may vindicate rights that should be scrupulously observed, and hence, such a case is not, nor should it be, moot."). For these reasons, Morrison's nominal-damages claim is not moot.

## 2. Morrison's Standing

We next consider Morrison's standing to bring his nominal-damages claim. The key questions here are whether a past "chill" on a plaintiff's speech is a sufficient injury to confer standing and whether nominal damages sufficiently redress such a harm.

Generally, concerns regarding "chilled" speech are forward-looking. For example, the doctrine of overbreadth constitutes an exception to prudential standing requirements and permits a party with constitutional standing to raise First Amendment claims of third parties who are not present, but whose speech may be chilled in the future if the regulation stands. *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349 (6th Cir. 2007); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1367 (10th Cir. 2000). Similarly, a statute may be void for vagueness if it would deter would-be speakers from speaking because they cannot tell whether their intended speech falls within the statute's prohibitions. *See, e.g.*, *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) ("The vagueness of [a content-based speech] regulation raises special First Amendment concerns because

of its obvious chilling effect on free speech."); *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (noting that a vague statute "operates to inhibit the exercise of [First Amendment] freedoms" (citation omitted)).  Here, however, Morrison focuses on a *past* chill, rather than a future chill, arguing that he *would have* spoken during the 2004-05 school year, but that the speech code then in effect prevented him from doing so.

To determine whether such a chill confers standing, we apply a three-part test.  A plaintiff has constitutional standing when he or she can show:  (1) an injury-in-fact that; (2) was "fairly traceable to the defendant's allegedly unlawful conduct"; and (3) is "likely to be redressed" via a favorable decision. *Prime Media*, 485 F.3d at 349 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  We consider these parts in turn.

### a. Injury-In-Fact

The Supreme Court has defined an "injury-in-fact" as "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).  If a prospective chilling effect on speech is sufficiently injurious that courts allow parties otherwise without prudential standing to raise a claim designed to prevent this chill (via an overbreadth challenge), then a past chill must constitute an injury in fact.

Case law supports this conclusion.  Our sister circuits have held, both implicitly and explicitly, that a past chill is a constitutional injury-in-fact.  For instance, in *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000), the Ninth Circuit held that government officials' "eight-month investigation into the plaintiffs' [associational] activities and beliefs chilled the exercise of their First Amendment rights," which entitled the plaintiffs "to seek a remedy for this constitutional violation." *Id.* at 1226. Similarly, in *National Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521 (10th Cir. 1994), the Tenth Circuit held that an organizational plaintiff could premise a *Bivens* claim seeking damages for a violation of First Amendment associational rights upon overzealous investigative procedures that had a chilling effect on its members' associational rights. *Id.* at 1530.  The court implicitly concluded that a chill represents an injury-in-fact, stating that the plaintiffs could "establish their First Amendment claim" by "prov[ing] wrongful conduct by the defendant and that such conduct had a chilling effect on the plaintiffs' organizational activities and associational rights." *Id.* at 1531 n.4.

Additionally, in *Howard Gault Co. v. Texas Rural Legal Aid, Inc.*, 848 F.2d 544 (5th Cir. 1988), the Fifth Circuit suggested, if not implicitly held, that chilled speech constitutes an injury-in-fact.  There, the court sustained an award of damages to compensate a plaintiff "for whatever injuries [he] may have suffered to his reputation and from the chilling effect the TRO had on the exercise of his First Amendment rights." *Id.* at 557.  And more recently, the Second Circuit joined this chorus with its opinion in *Husain v. Springer*, --- F.3d ---, No. 04-5250-CV, 2007 WL 2020028 (2d Cir. July 13, 2007).  In *Husain*, a group of college-student journalists sued, claiming that the college president violated their First Amendment rights by nullifying the results of, and rescheduling, a student-government election in response to a hyper-partisan issue of a college newspaper.  They sought nominal damages and premised this First Amendment claim upon chilled speech, specifically, the paper's subsequent reduction in election coverage out of fear that favorable coverage would lead to the disqualification of a candidate. *See id.* at *6 (noting that "the *College Voice* editors decided to give their endorsement of [a student party running the subsequent school year] less prominence" as a result of the election nullification).  Even though the results of the nullified election and the subsequent election were identical, the court held that the "chilling effect" upon the paper's coverage "g[ave] rise to a First Amendment injury." *Id.* at *14; *see also id.* (concluding that the election nullification "violated the plaintiffs' First Amendment rights as a result

of the chill on student speech that it created"). Each of the aforementioned cases indicates that a past chill of expressive conduct constitutes a constitutional injury-in-fact sufficient to confer standing; to our knowledge, no circuit has concluded to the contrary.[6]

The only arguably contrary case we have located is *Laird v. Tatum*, 408 U.S. 1 (1972). In *Laird*, a group of citizens brought a class action seeking declaratory and injunctive relief, arguing that the Army's investigative and data-gathering activities chilled their exercise of First Amendment rights. The Supreme Court concluded that the plaintiffs had not alleged a sufficiently specific injury, noting that a "subjective chill" cannot substitute for "specific present objective harm or a threat of specific future harm." *Id.* at 13-14.

We do not believe this concern regarding a "subjective chill" applies here, as *Laird* is easily distinguishable. Most significantly, the *Laird* Court addressed only claims for forward-looking relief, specifically declaratory and injunctive relief. In this case, by contrast, we consider only Morrison's claim for *retrospective* relief in the form of nominal damages. Accordingly, like the plaintiffs in *Husain* and unlike the plaintiffs in *Laird*, "the threat or chill that [Morrison] assert[s that he] felt . . . is not merely subjective, but has already been experienced." *Husain*, 2007 WL 2020028 at *14 (internal quotation marks omitted).

Additionally, *Laird* was a narrow decision, and the Court took pains to cabin its holding to the particular facts of that case, stating, "[O]ur conclusion is a narrow one, namely, that on this record the respondents have not presented a case for resolution by the courts." *Laird*, 408 U.S. at 15. Beyond the distinction noted above, this case is very different from *Laird*.

The *Laird* Court emphasized that it faced a case in which "the chilling effect ar[o]se merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual." *Id.* at 11. To the contrary, in this case (as in a series of other "chilling" cases that the *Laird* Court distinguished), "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the plaintiff was either presently or prospectively subject to the regulations, proscriptions or compulsions that he [i]s challenging." *Id.* at 11. More specifically, Morrison challenges a *rule* that was intended to govern his speech and that of his cohorts, not data-gathering activities. Consequently, this is not a case in which the plaintiff has "left somewhat unclear the precise connection between" the action or policy complained of and the chill alleged, as was the case in *Laird*. *Id.* at 13 n.7. The *Laird* Court's concern regarding a significant attenuation between the action or policy complained of and the chill alleged does not apply here. *See infra* Pt. III.A.2.(b). Moreover, the *Laird* Court was also motivated by its desire to avoid the federal courts becoming "virtually continuing monitors of the wisdom and soundness of Executive action." *Id.* at 15. This case presents no such threat.

For the foregoing reasons, we conclude that *Laird* does not control, and therefore we follow the lead of the Second, Fifth, Ninth, and Tenth Circuits (in *Husain*, *Howard Gault Co.*, *White*, and *Archer*, respectively). Accordingly, we hold that chilled speech constitutes a sufficient injury-in-fact to satisfy the first part of the test for standing.

---

[6] In the Fourth Circuit, Judge Michael argued persuasively in dissent that previously chilled speech presents "a classic First Amendment injury." *Reyes v. City of Lynchburg*, 300 F.3d 449, 458 (4th Cir. 2002) (Michael, J., dissenting). The majority opinion neither quibbled with nor endorsed this view, but instead concluded that the plaintiff failed to show that the defendant city's decision to prosecute him had chilled his speech. *Id.* at 455 n.8.

### b. Causation

Morrison easily satisfies the causation part of the standing inquiry. The Complaint alleges that "[t]he named student plaintiff has refrained from conveying his views on homosexuality to his classmates because the School District policies restricting speech prohibit him from doing so." J.A. at 26 (Compl. ¶ 34). Further, Morrison testified through affidavit that he held his tongue because of the policy. This testimony is uncontroverted.

### c. Redressability

Finally, we conclude that Morrison satisfies the third part—redressability—of the standing inquiry. Although a favorable decision cannot provide Morrison an opportunity to travel back in time and utter the speech he withheld, it can provide him with nominal damages. Even though these damages amount to little, they serve to vindicate his rights.

*Utah Animal Rights Coalition* implicitly holds that nominal damages are sufficient to redress an injury similar to Morrison's. In that case, prospective organizers applied for permits to demonstrate on public property during the 2002 Winter Olympics. After the city delayed acting on their application, they sued. While the suit was pending, the city denied their application. They reapplied, and the city then approved this subsequent application, but the litigation did not terminate. After the Olympics had ended, the organizers continued to pursue their suit, premising a claim for nominal damages upon the city's initial delay. Their asserted injury was akin to Morrison's chilled speech: a hampered ability to plan and coordinate their expressive activities. 371 F.3d at 1256. On appeal, the Tenth Circuit concluded that the organizers had standing to pursue their nominal-damages claim. *Id.*[7] If nominal damages were sufficient to redress the hampering of the organizers' speech activities, then they are also sufficient to redress Morrison's chilled speech.

Along the same lines, *Husain* indicates that a claim for nominal damages is sufficient to redress previously chilled speech. By the time the case reached the Second Circuit, the plaintiffs' claims for injunctive and declaratory relief had become moot, leaving only their claims for nominal compensatory and punitive damages pending. *Husain*, 2007 WL 2020028 at *8 n.10, *21 n.17. Nonetheless, the *Husain* court held that the college's nullifying the results of a student-government election in response to articles written in a college-sponsored and student-run newspaper chilled the student journalists' speech and accordingly violated their First Amendment rights. As in *Utah Animal Rights Coalition*, if the *Husain* plaintiffs' nominal-damages claim was sufficient to redress their chilled speech, then so, too, is Morrison's. Accordingly, Morrison has established the third part of the standing inquiry.

For these reasons, we conclude that Morrison has standing to pursue his free-speech claim seeking nominal damages.

## B. Merits

The Board asks us to affirm the district court's grant of summary judgment on the merits, arguing that the policies in effect during the 2004-05 school year were consistent with the standard set out in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969). At the same time, Morrison asks us to grant him summary judgment on his nominal damages claim

---

[7] Judge McConnell issued a lengthy concurrence disagreeing with the rule that nominal damages are sufficient to thwart a challenge for mootness. *Utah Animal Rights Coal.*, 371 F.3d at 1262-71. Despite his position that nominal damages were "not the real objective of the litigation," *id.* at 1264, and "symbolic only," *id.*, Judge McConnell never questioned whether nominal damages were sufficient to satisfy the redressability prong of the standing inquiry.

because his affidavit testimony that he withheld his speech because of the policy was uncontradicted, and because the policy, he claims, fails to comport with *Tinker*. We decline both parties' entreaties and instead **REVERSE** the district court's judgment insofar as it pertains to Morrison's free-speech claim seeking nominal damages, and **REMAND** for further proceedings. We do so for two reasons.

First, there remains a genuine issue of material fact regarding the policy applicable to Morrison during the 2004-05 school year. The Board contends that Morrison could not have been disciplined because the *school district*'s speech policy contained a savings clause preventing it from "apply[ing] to speech otherwise protected under the state or federal constitutions . . . ." J.A. at 120 (2004-05 Sch. Dist. Policy 09.42811). The BCHS Code, by contrast, contains no such savings clause in either of its definitions of harassment. The first definition restricted harassment to "unlawful behavior based on" a protected characteristic, including sexual orientation, "that is sufficiently severe, pervasive, or objectively offensive that it adversely affects a student's education or creates a hostile or abusive educational environment." J.A. at 270 (2004-05 BCHS Student Code at 3). This definition tacks quite closely to the *Tinker* standard. *See Tinker*, 393 U.S. at 513 (holding that schools cannot restrict student speech that neither "materially and substantially interfer[es] with the requirements of appropriate discipline in the operation of the school" nor "collid[es] with the rights of others"). The other definition, by contrast, does not. Under the heading "DISCIPLINARY INFRACTIONS," the 2004-05 BCHS Code defined harassment to include "the use of language . . . in such manner as to be commonly understood to convey hatred, contempt, or prejudice or to have the effect of insulting or stigmatizing an individual." J.A. at 277 (2004-05 BCHS Student Code at 16). Immediately following this definition, the BCHS Code listed a series of consequences for violating the prohibition on harassment, which could be read as implying that this represents the operative definition of harassment.

If these inconsistencies were not enough, it is also unclear to what extent the statements in the training video represented the school's policy. The video's prohibition appears to have been even broader than the latter definition of harassment in the Student Code, as the video informed students that "[t]here is not permission for you to point . . . out" areas in which they disagree with other students. J.A. at 229 (BCHS Training Video Tr. at 29). Because the district court did not address the merits of Morrison's free-speech claim, it did not have occasion to determine which policy governed Morrison's conduct at school during the 2004-05 academic year. We decline to address this issue in the first instance, concluding that the more prudent course of action is to remand the case to the district court for appropriate factual development.

Second, even if we were certain that the policy violated *Tinker*, we do not believe this alone would be sufficient for Morrison to establish a First Amendment claim premised entirely upon a past chill. Such a holding would permit anyone who had, at one time, operated under an unconstitutional speech policy to sue (within the applicable statute of limitations) and win merely by filing an affidavit claiming that the policy prevented him or her from saying something that he or she wished to say. This would be so even if the speech policy were no longer in existence. The problem with such a scenario is that, because the potential plaintiff never spoke and the regulation in question was never affirmatively applied against him or her, courts would be unable to tell whether the plaintiff *actually* suffered the alleged harm, i.e., the past chill. Rather than allowing a plaintiff to premise such a claim on purely subjective allegations, we believe that a more objective inquiry is also necessary.

We find support for such a requirement in our case law, specifically in our jurisprudence regarding First Amendment retaliation claims. Plaintiffs alleging such claims must prove that "an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in [First Amendment-protected] conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). This element introduces an objective component into the First

Amendment inquiry by requiring that the adverse action "would deter a person of ordinary firmness from" exercising First Amendment rights. Along these lines, we hold that when a plaintiff seeks to prove under the First Amendment a damages claim premised upon a past chill, he or she must establish that the policy or action of the defendant would deter a person of ordinary firmness from exercising his or her First Amendment rights in the way the plaintiff alleges he or she would have, but for the defendant's action or policy.[8] We are not alone in this holding, as the Ninth Circuit requires plaintiffs in similar cases to establish this element. *See White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000).

As the parties have not had occasion to address this element, we do not do so either, but instead leave it for the district court to do so on remand.

## IV. CONCLUSION

For the reasons described above, we hold that an allegation of a past chill of First Amendment-protected activity is sufficient to confer standing to a plaintiff seeking retrospective relief, even when that relief comes in the form of nominal damages. We further hold that to establish such a claim, a plaintiff must show that the defendant's actions or policy would deter a person of ordinary firmness from exercising his or her First Amendment liberties in the way that the plaintiff alleges he or she would have, were it not for the defendant's conduct or policy. Consequently, we **REVERSE** the district court's grant of summary judgment to the Board, but only insofar as it pertains to Morrison's free-speech claim seeking nominal damages. We also **REMAND** this case to the district court for further proceedings consistent with this opinion.

---

[8] Additionally, such a requirement should allay any concern regarding a past chill's failing to allege a "specific present objective harm or a threat of specific future harm" under *Laird*. 408 U.S. at at 13-14.

---

## DISSENT

---

COOK, Circuit Judge, dissenting. "This is a case about nothing."[1] The majority burdens a federal district judge with a full-blown trial to determine whether to award the plaintiff a single dollar if a policy no longer in effect was unconstitutional despite never being enforced against the plaintiff. I cannot join an opinion that calls for such an exercise.

I note at the outset that the defendant here is the *school district*. It is not the high school code of conduct, the high school, or any particular administrator. I note further that the plaintiff in this case chose caution and remained silent rather than risk discipline for engaging in protected activity. As much as he (and the attorneys driving this litigation) might wish to keep the facial challenge to the 2004-05 code of conduct alive, the fact remains that they have *already won* that challenge when they forced the district, under court supervision, to change its policy. All that remains is an as-applied pre-enforcement challenge for nominal damages based on Morrison's choice to chill his own speech based on his perception that he would be disciplined for speaking.

But whether he would have been, we can only speculate. And to avoid allowing standing based on guesswork, we require an imminent threat of prosecution and an actual intention to violate the policy at issue. *See, e.g.*, *Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002); *NRA of Am. v. Magaw*, 132 F.3d 272, 285 (6th Cir. 1997). But the school district's—again, the actual defendant here—former discipline policy regarding instances of harassment or discrimination states that it "shall not be interpreted as applying to speech otherwise protected under the state or federal constitutions where the speech does not otherwise materially or substantially disrupt the educational process." I see no evidence in the record that the school district would have punished him for protected speech in violation of its own policy. We cannot find a school district constitutionally liable for chilling student speech every time a student chooses caution over risking possible discipline.

Nor do I see how nominal damages would redress an injury of "past chill." Nominal damages is, as Morrison's counsel discussed at oral argument, a vehicle for a declaratory judgment. *See Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1265 (10th Cir. 2004) (McConnell, J., concurring). While we may have allowed a nominal-damage claim to go forward in an otherwise-moot case, *see Murray v. Bd. of Trs.*, 659 F.2d 77, 79 (6th Cir. 1981), we are not required to relax the basic standing requirement that the relief sought must redress the injury that occurred. And nominal damages based on a regime no longer in existence has *no* effect on the parties' legal rights. *See Utah Animal Rights Coal.*, 371 F.3d at 1264.

This case should be over. The school district has, at the behest of the plaintiffs and intervenors, adopted a policy that properly balances the district's duty to protect openly gay and lesbian students with the important First Amendment right of allowing students to speak their minds. Keeping this case alive for a determination on the constitutionality of an obsolete code of conduct in the hope of awarding the plaintiff a single dollar vindicates no interest and trivializes the important business of the federal courts in protecting actual constitutional violations. My colleagues on the panel having seen the matter differently, I respectfully dissent.

---

[1] *Husain v. Springer*, No. 04-5250, 2007 U.S. App. LEXIS 16701, at *71 (2d Cir. July 13, 2007) (Jacobs, C.J., dissenting).