ELECTRONIC CITATION:  2008 FED App. 0014P (6th Cir.)
File Name:  08b0014p.06

# BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT

| | | |
|---|---|---|
| In re:  GERALD A. WINGERTER and<br>JANET G. KELLER-WINGERTER,<br><br>Debtors. | )<br>)<br>)<br>)<br>) | No. 07-8063 |

Appeal from the United States Bankruptcy Court
for the Northern District of Ohio, Eastern Division.
Bankruptcy Case No. 06-50120.

Argued:  May 14, 2008

Decided and Filed:  October 8, 2008

Before:  FULTON, PARSONS, and SCOTT, Bankruptcy Appellate Panel Judges.

_____

**COUNSEL**

**ARGUED:**  Jonathan W. Young, WILDMAN, HARROLD, ALLEN & DIXON, Chicago, Illinois, for Appellant.  **ON BRIEF:**  Jonathan W. Young, John W. Costello, Jeffrey L. Gansberg, WILDMAN, HARROLD, ALLEN & DIXON, Chicago, Illinois, Jeremy M. Campana, Alan R. Lepene, THOMPSON HINE, Cleveland, Ohio, for Appellant.  Professor Dan S. Schechter, LOYOLA LAW SCHOOL, Los Angeles, California, for Amicus Curiae.

------------------------

**OPINION**

------------------------

THOMAS H. FULTON, Bankruptcy Appellate Panel Judge. B-Line, LLC ("B-Line") appeals a bankruptcy court order sanctioning it under Federal Rule of Bankruptcy Procedure ("Rule") 9011(b). The bankruptcy court issued its order after a show cause order and an evidentiary hearing to determine the procedures that B-Line employs for processing and filing proofs of claim. The court was concerned that B-Line, a company that exclusively purchases claims in bankruptcy, does not request copies of originating documents before filing a proof of claim despite the requirement in Rule 3001(c) and Official Form 10 that such documents be attached to proofs of claim.

## I.    ISSUES ON APPEAL

Whether the bankruptcy court abused its discretion in issuing an order (1) concluding that B-Line did not fulfill its obligations under Rule 9011 when it filed its proof of claim in the debtors' case; and (2) expressing the court's view generally that filing a proof of claim without review of originating documents falls short of reasonable inquiry under Rule 9011 when the obligation is not scheduled by the debtor and the purchase of the claim is not accompanied by reliable representations of validity.

## II.    JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Appellate Panel of the Sixth Circuit has jurisdiction to decide this appeal. The United States District Court for the Northern District of Ohio has authorized appeals to the Panel and a final order of the bankruptcy court may be appealed as of right pursuant to 28 U.S.C. § 158(a)(1). For purposes of appeal, a final order "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989) (citations omitted). The bankruptcy court's order

imposing sanctions on B-Line for violating Rule 9011 in this case is a final order. *Buckeye Retirement Co., LLC, Ltd. v. Hake (In re Hake)*, 2006 WL 2621116 (B.A.P. 6th Cir. 2006) (unpub.)[1]

Decisions regarding the imposition of sanctions under Rule 9011 are reviewed for abuse of discretion. *Timmons v. Cassell (In re Cassell)*, 254 B.R. 687 (B.A.P. 6th Cir. 2000) (citing *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 711 (6th Cir. 1999)). "An abuse of discretion occurs only when the [trial] court relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard." *Volvo Commercial Fin. LLC the Americas v. Gasel Transp. Lines, Inc. (In re Gasel Transp. Lines, Inc.)*, 326 B.R. 683, 685 (B.A.P. 6th Cir. 2005) (citing *Schmidt v. Boggs (In re Boggs)*, 246 B.R. 265, 267 (B.A.P. 6th Cir. 2000)). A court also abuses its discretion if, upon review, the appellate court is left with a "definite and firm conviction that the [bankruptcy court] committed a clear error of judgment." *Barlow v. M.J. Waterman & Assocs., Inc. (In re M.J. Waterman & Assocs., Inc.),* 227 F.3d 604, 607-08 (6th Cir. 2000) (quoting *Soberay Mach. & Equip. Co. v. MRF Ltd., Inc.*, 181 F.3d 759, 770 (6th Cir. 1999)). "The question is not how the reviewing court would have ruled, but rather whether a reasonable person could agree with the bankruptcy court's decision; if reasonable persons could differ as to the issue, then there is no abuse of discretion." *Mayor and City Council of Baltimore, Md. v. W. Va. (In re Eagle-Picher Indus., Inc.)*, 285 F.3d 522, 529 (6th Cir. 2002).

The court's findings of fact are reviewed under the clearly erroneous standard. *Riverview Trenton R.R. Co. v. DSC, Ltd. (In re DSC, Ltd.)*, 486 F.3d 940, 944 (6th Cir. 2007). "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S. Ct. 1504 (1985)).

---

[1] An order imposing Rule 9011 sanctions is only final upon assessment of fees and expenses. *Buckeye Retirement Co., LLC, Ltd. v. Hake (In re Hake)*, 2006 WL 2621116 (B.A.P. 6th Cir. 2006) (unpub.) (citing *In re Jeannette Corp.*, 832 F.2d 43, 46 (3rd Cir. 1987)). The bankruptcy court found that "[b]ecause of the time and energy that B-Line's senior management devoted in response to this Court's show cause order . . . the Court does not view any further sanctions to be necessary in this case." Because the bankruptcy court essentially assessed fees and expenses in the form of the show cause hearing itself and the attendant preparation, the order is sufficiently final. *Compare In re Jeannette Corp.*, 832 F.3d at 46 (explaining that order imposing sanctions is not final where the amount or form of sanction is not yet determined).

## III. FACTS

Gerald Wingerter and Janet Keller-Wingerter ("Debtors") filed a chapter 13 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Ohio on February 7, 2006. According to the chapter 13 plan that was filed on the same date, the Debtors would pay their unsecured creditors 100%. B-Line, LLC ("B-Line") filed a proof of claim for an unsecured claim in the amount of $431.57 on March 17, 2006, thirty-eight days after the Debtors filed their chapter 13 petition and nearly two months before the deadline for filing proofs of claim.

As its proof of claim, B-Line submitted a copy of Official Form 10 ("Form 10") that listed "B-Line LLC/Covenant Management/GTE" as the name of creditor. B-line's Form 10 was incomplete or incorrect in several places: it stated that the basis for the claim was "money loaned;" the space for "Date debt was incurred" was left blank; and B-Line did not submit any copies of the original documents evidencing the Debtors' obligation. The only additional document B-Line filed with Form 10 was a single computer-generated sheet entitled "Account Summary" that contained the following information:

| | |
|---|---|
| Debtor Name: | WINGERTER, GERALD A |
| Debtor SSN: | XXX-XX-8300 |
| Debtor Address: | 644 STAR DR. |
| End Balance: | $431.57 |
| Last Payment Date: | |
| Last Payment Amount: | |
| Last Purchase Date: | |
| Last Purchase Amount: | |
| Original Creditor: | GTE |
| Related Account Number: | XXXXXXXXXXXX1221 |

On September 1, 2006, the Debtors filed an objection to B-Line's claim on grounds that they were unaware of any contract or extension of credit with GTE or B-Line. On September 14, 2006, B-Line filed a response to the Debtor's objection, requesting an extension of sixty days "to obtain supporting documentation for its claims pursuant to Rule 9006 because the Debtors did not schedule the debt." The bankruptcy court denied B-Line's request for additional time, and a hearing was held

on October 19, 2006, with respect to the Debtors' objection to B-Line's claim. At this hearing, the Debtors testified that they had no recollection of ever entering into any contract with GTE or B-Line.

The bankruptcy court found the Debtors' testimony credible and made a specific factual finding accordingly. At the October 19 hearing, the bankruptcy court scheduled another hearing for January 11, 2007, and prohibited B-Line from withdrawing its proof of claim unless it provided a "complete explanation" therefor. On January 3, 2007, in direct contravention of the bankruptcy court's order, B-Line filed a document withdrawing its proof of claim without filing an accompanying explanatory statement.

On January 8, 2007, five days later, B-Line submitted a sworn affidavit by Steven G. Kane ("Kane"), the records custodian and operations manager of B-Line. Kane averred that, according to B-Line's computer database, in March 2006 B-Line purchased from Covenant Management Group, LLC ("Covenant") an account that Gerald Wingerter originally opened with GTE Communications Company on December 21, 1993.[2] Kane further averred that the account had an outstanding balance of $431.57 when it was purchased from Covenant by B-Line.

Pursuant to a forward-flow purchase agreement ("Purchase Agreement") entered between Covenant and B-Line, B-Line would purchase from Covenant, on a periodic basis, claims on accounts for which the obligor on each purchased account had filed a chapter 13 bankruptcy petition. The claim purportedly owed by Gerald Wingerter was among the "portfolio" of claims B-Line had purchased from Covenant in March 2006. The affidavit stated that B-Line withdrew its proof of claim on January 3, 2007, after GTE informed B-Line that it was unable to locate original documentation evidencing the Debtors' account.

On January 11, 2007, the bankruptcy court held another hearing during which it expressed concern that B-Line had filed a proof of claim without sufficient inquiry into the factual or legal basis for the claim. In order to address the matter further, the bankruptcy court scheduled a hearing at which B-Line would "provide the Court with an explanation of its procedures regarding the due

---

[2] Although the Kane Affidavit did not mention any intervening purchasers between the original creditor and Covenant, testimony offered later by representatives of Covenant or B-Line reveal that Covenant had purchased the claim at issue as a part of a portfolio of claims purchased from Professional Recovery Systems, LLC ("PRS") on December 22, 2000. Additionally, PRS was believed to have purchased the claim at issue, not from GTE directly, but from another intervening party.

diligence it conducts to assure itself of the validity of a claim before filing a proof of claim." B-Line was directed to file a written explanatory statement prior to the hearing. The bankruptcy court entered an order to this effect on January 26, 2007.

B-Line filed an explanatory statement on February 16, 2007. In the statement, B-Line explained that it had entered the Purchase Agreement with Covenant in 2004. B-Line disclosed the requirements for accounts it purchases from Covenant: (1) the debtor must be in a chapter 13 bankruptcy proceeding; (2) the debt has not been disputed or discharged; (3) the amount owed is accurate; (4) the statute of limitations on the claim has not expired; and (5) the debt is not fraudulent. B-Line stated further that "According to the Purchase Agreement, Covenant . . . represents that it will use reasonable efforts in accordance with industry standards to create computer files for each account and will provide account documents where available."

Additionally, in its statement, B-Line explained that GTE had merged with another telecommunications company in 2000 to form Verizon Communications Company. The Debtors included a debt owed to Verizon on the schedules accompanying their bankruptcy petition. Although the account number for the Verizon account scheduled by the Debtors did not match the GTE account number purchased by B-Line, B-Line opined that the scheduled debt owed to Verizon might be the same as the claim held by B-Line that was originally owed to GTE. Finally, B-Line stated that it had intended the affidavit submitted by Kane to satisfy the bankruptcy court's requirement that a "complete explanation" accompany the withdrawal of B-Line's proof of claim, but that the Kane affidavit was filed five days later because it had to be sent to a different B-Line attorney prior to filing.

On March 8, 2007, the bankruptcy court entered a Show Cause Order and Notice of April 12, 2007 Hearing ("Show Cause Order"), in which it specifically recounted B-Line's withdrawal of its proof of claim in direct contravention of the bankruptcy court's order. The bankruptcy court stated further in this Show Cause Order:

> The plan in the instant chapter 13 case provides that the Debtors will pay a 100% dividend to the holders of unsecured claims. Thus, the Debtors had an incentive, absent in the more common "pot plan" cases, to review the validity of the proofs of claims that had been filed in their bankruptcy. In response to the Court's inquiry, the Chapter 13 Trustee's Office serving Akron reports that in January and February of this year, it disbursed over $15,000 to B-Line. If one makes the assumption that

$7,500 represents an average monthly distribution in regard to the chapter 13 cases pending in each of approximately 350 bankruptcy judges' dockets in the United States, one arrives at the working assumption that B-Line is receiving monthly chapter 13 distributions, on a national aggregate basis, of over 2.6 million dollars. Thus, this Court deems it material to the integrity of the bankruptcy system to determine whether B-Line's procedures for filing proofs of claim are based on a reasonable inquiry, prior to filing, as to whether there is admissible evidentiary support for the claim.

(Appellant's App. Vol. I., Sect. 8 at 3.) The Show Cause Order then directed B-Line to file a pre-hearing brief and proffer evidentiary support "showing cause why B-Line should not be sanctioned under Rule 9011 for its acts in filing the B-Line [Proof of Claim] and in withdrawing that same claim without an order of the Court pursuant to Rule 3006 or a lifting of the Court's oral directive that the claim could not be withdrawn." Finally, the Show Cause Order set forth eleven specific questions that it expected B-Line to answer through the evidence it was to present at the April 12, 2007 hearing.

These eleven questions focused on four primary issues: (1) how much human oversight, inquiry, or review did B-Line dedicate to the bankruptcy claims filing process, and how much of the work in filing a proof of claim was simply generated by computer software with no human oversight or review; (2) how and when did B-Line obtain certain specific information relating to the purported account between the Debtors and GTE; (3) what information did B-Line actually receive from Covenant regarding the Debtors' account, and what information was B-Line contractually obligated to receive from Covenant; and (4) what evidence did B-Line accrue from sources other than Covenant that was included on the proof of claim filed in the Debtors' bankruptcy case.

B-Line filed its pre-hearing brief in which it purported to answer the questions posed by the bankruptcy court. Along with its brief, B-Line filed sworn declarations of Rui Pinto-Cardoso, B-Line's President and Chief Operating Officer, Kane and Lihn K. Tran, B-Line's in-house counsel. These declarations contained statements the declarants were prepared to offer as testimony in order to answer the eleven questions in the Show Cause Order.

Ultimately, two evidentiary hearings were held on April 12, 2007, and May 21, 2007, and the bankruptcy court ordered post-trial briefs to be filed by June 22, 2007, at which point the matter was taken under advisement. The bankruptcy court issued an opinion and order on October 1, 2007, concluding that:

particularly where a debtor has not scheduled any claim resembling the purportedly assigned obligation that a claim purchaser wants to file in the debtor's case, the claim purchaser needs to discharge its obligations under Rule 3001 and Rule 9011 at the time it files a proof of claim. The assignee should not be able to shift the expense of the initial examination of claims to other interested parties, e.g., chapter 7 trustees and chapter 13 debtors and trustees. More specifically, the Court finds that when the debtors have not scheduled any claim listing the originating creditor, Rule 9011 requires a claim purchaser, before filing a proof of claim with a bankruptcy court, to obtain originating documents or, when such documents are not available, a clear understanding of the nature of the original dealings that support the assertion of a claim against the particular debtor. Having obtained those documents or that clear understanding, the claim purchaser should then attach to the proof of claim form the originating documents or an affidavit explaining the non-availability of such "media" to the proof of claim form so the debtor and other interested parties are given fair notice of the source and particulars of the claim.

*In re Wingerter*, 376 B.R. 221, 224 (Bankr. N.D. Ohio 2007).

The bankruptcy court found that, in addition to erroneously stating that the basis for B-Line's claim was "money loaned," Form 10 accompanying B-Line's proof of claim was incomplete because queries for "Date debt was incurred" and "Charges made Prior to Filing" were left blank; B-Line did not respond to the query asking whether the claim included interest or other charges in addition to the principal amount of the claim (Part 5 of the Form); B-Line did not comply with the instructions on Form 10 to "[a]ttach itemized statement of all interest or additional charges"; B-Line did not comply with Part 7 of Form 10, which instructs the claimant either to attach copies of originating documents or to explain the unavailability thereof. Moreover, no testimony was offered as to how the interest rate applied by Covenant to the outstanding balance purportedly owed was reached.

The bankruptcy court also made the following pertinent factual findings:

31.    B-Line's Pre-hearing Brief further acknowledged the fluidity of the computer data set when it stated that computer files generated by the original creditor are "updated to reflect any payments, credits or other transactions" and "therefore represents the best and most current summary of the overall status of the purchased account" . . . .

. . . .

33.    Covenant was never in possession of, or reviewed, originals or copies of any application by Gerald Wingerter for services from GTE or any signed agreement between those parties. Nor did Covenant possess or review copies of any account statements mailed to Mr. Wingerter.

34.    The purported assignment from Covenant to B-Line of a claim against a Mr. Wingerter rests upon the Covenant/B-Line Forward Flow Agreement. Under

this agreement, B-Line periodically purchases accounts owned by Covenant as to which Covenant has been notified of a bankruptcy filing.

. . . .

36.     Section 5.7 of the Covenant/B-Line Forward Flow Agreement, which is titled "computer files" states: "Seller has used reasonable efforts in accordance with industry standards to create Computer Files which set forth each Account designated in the Term Agreement, each of which meets the Eligibility Requirements of the Cut-Off Date."   When trying to find a warranty or representation as to the validity of the claims acquired by B-Line from Covenant in the Covenant/B-Line Forward Flow Agreement, B-Line's counsel points to that section, arguing that it should be pieced together with the section on Eligibility Requirements.  The court finds, however, that there is no representation or warranty in the Covenant/B-Line Forward Flow Agreement as to the validity or enforceability of the claims summarized in the data transmitted from Covenant to B-Line.

37.     Rather, if an account in the purchased portfolio is not valid, B-Line has a contractual remedy against Covenant, i.e., B-Line is entitled to "reassign" the account to Covenant and to receive complete reimbursement of amounts paid to B-Line to Covenant with respect to that account.

*In re Wingerter*, 376 B.R. at 229-30.

The bankruptcy court concluded that, although B-Line did not file its proof of claim for any improper purpose, B-Line failed to comply with its obligations under Rule 9011(b) to make a reasonable inquiry into the basis of its claim before filing the proof of claim in a bankruptcy case because it made no effort to comply with Rule 3001(c) and Form 10.  The court reasoned that when a potential bankruptcy creditor has only limited information about a debtor, and the information it holds was not warranted by the seller of the claim, the bankruptcy creditor's obligation under Rule 9011(b)(2) and (3) requires the creditor to do more than simply file a proof of claim based on information from a bulk claims seller and wait to see whether the debtor in bankruptcy will object to the claim before the bankruptcy creditor conducts its own inquiry into the basis for its claim.  The court pointed out that Rule 3001(a) directs compliance with the Official Forms.  B-Line did not comply with Rule 3001(a) when it filed an incomplete Form 10 despite having sufficient information to complete the queries on the form; its regular procedures for filing proofs of claim simply did not make use of this information.  B-Line failed to comply with Form 10 because it did not append copies of the originating documentation or assert that the documents were too voluminous to do so.  In the bankruptcy court's view, this omission indicated that B-Line "neglected [its] obligations to

make reasonable inquiry"–sanctionable conduct. Further, Rule 3001(c) requires copies of originating documents to be filed with a proof of claim when the claim at issue is based on a writing. Yet, by its own admission, B-Line never requested or made any attempt to obtain copies of the written agreement from which the claim purportedly derived. The bankruptcy court also was troubled by the fact that B-Line filed its incomplete proof of claim and Form 10 roughly ninety days before the deadline for filing proofs of claim in the Debtor's bankruptcy case.

Despite finding that B-Line failed to comply with its obligations under Rule 9011(b), the bankruptcy court did not issue monetary sanctions against B-Line or direct B-Line to take, or refrain from taking, any specific action. Instead, the court deemed the expenses incurred by B-Line in participating in the prior evidentiary hearings to be a sufficient sanction.

Lastly, the bankruptcy court expressed its view generally regarding Rule 9011(b) and the filing of proofs of claim by stating, *inter alia*, as follows: "As a prospective matter, B-Line and other purchasers in the claims trading industry should understand that this Court *views* the filing, without review of originating documents, of a proof of claim by an assignee/purchaser to fall short of reasonable inquiry under Rule 9011 when the obligation has not been scheduled by the debtors and the purchase of the claim was not accompanied by reliable representations of claim validity." (Emphasis added) The bankruptcy court stated, in conclusion[3]:

> When debtors have not admitted, through their schedules, the validity of the claim in the hands of the originating creditor or any of its assignees, the filer *should* comply with Rule 3006 and complete Official Form 10 by taking the time to obtain and review originating documents before filing any proof of claim. If originating documents cannot be obtained, and the assignee decides to file a proof of claim notwithstanding the absence of such documents, the assignee must comply with Rule 3006 and Official Form 10 by providing a *clear explanation* (which would include all non-confidential information in the hands of the assignee) of how the initial obligation arose and setting forth the warranties and representations in the chain of transfers that the assignee relies upon in asserting its claim.

*In re Wingerter*, 376 B.R. at 239 (emphasis added).

---

[3] The bankruptcy court made a similar statement in the introduction of its opinion.

## IV.   DISCUSSION

In imposing Rule 9011 sanctions, a bankruptcy court must determine whether the individual's conduct was reasonable under the circumstances.  In applying this test to the filing of proofs of claim, the bankruptcy court "is not to use the benefit of hindsight but 'should test the signer's conduct by inquiring what was reasonable to believe at the time the . . . [claim] . . . was submitted.'" *Timmons v. Cassell (In re Cassell)*, 254 B.R. 687, 691 (B.A.P. 6th Cir. 2000) (quoting *Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 481 (6th Cir. 1996)).  "Factors to consider in making this determination include the amount of time available for investigation, the nature of the investigation, and whether the claim is based on a plausible view of the law." *Id*. (citing *Davis v. Crush*, 862 F.2d 84, 88 (6th Cir. 1988)).  As discussed above, the Panel reviews imposition of Rule 9011 sanctions for abuse of discretion.

Before the Panel can address whether the bankruptcy court abused its discretion,  the Panel must address whether this appeal is moot or otherwise not justiciable.  In this regard, the bankruptcy court's order should be considered in two parts–the portion of the order directed at the case at hand and the portion ostensibly addressing future conduct.

The issue of mootness has not been raised by the parties.  However, because mootness suggests the question of jurisdiction, the Panel raises the issue *sua sponte*, and addresses the issue of mootness on the Panel's own motion.  *Berger v. Cuyahoga County Bar Assoc.*, 983 F.2d 718, 721 (6th Cir. 1993).  Under Article III of the United States Constitution, the Panel may adjudicate only actual, ongoing cases or controversies.  *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477, 110 S. Ct. 1249 (1990).

> [F]ederal courts have 'no authority to render a decision upon moot questions or to declare rules of law that cannot affect the matter at issue.' *NAACP v. City of Parma*, 263 F.3d 513, 530 (6th Cir. 2001) (citing *Church of Scientology v. United States*, 506 U.S. 9, 12, 113 S. Ct. 447, 121 L.Ed.2d 313 (1992)).  'Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S. Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (quoting *Powell v. McCormack,* 395 U.S. 486, 496, 89 S. Ct. 1944, 1951, 23 L.Ed.2d 491 (1969)); *see also Carras v. Williams*, 807 F.2d 1286, 1289 (6th Cir. 1986) ("Mootness results when events occur during the pendency of a litigation which render the court unable to grant the requested relief.").  This court determined mootness 'by examining whether an actual

> controversy between the parties exists in light of intervening circumstances.' *Fleet Aerospace Corp. v. Holderman*, 848 F.2d 720, 723 (6th Cir. 1988).

*Hood v. Keller*, 229 F. App'x 393 (6th Cir. 2007).

B-Line seeks reversal of the bankruptcy court's order finding B-Line in violation of Rule 9011. Even if the Panel were to find that B-Line did not violate Rule 9011[4], however, it cannot fashion any relief from the bankruptcy court's order because the only sanction levied was the answering of the show cause order. The Panel cannot undo the show cause hearings now. *See Carras v. Williams*, 807 F.2d 1286, 1289 (6th Cir. 1986) (where relief will not be forthcoming, appellant no longer has an interest in the outcome which justifies a federal court's decision on the underlying factual and legal issues). Because there is no live case or controversy, the issue of whether B-Line violated Rule 9011 in *this* case is moot. Where it is impossible for the Panel to grant any effectual relief, the appeal must be dismissed. *Church of Scientology of Cal. v. U.S.*, 506 U.S. 9, 12, 113 S. Ct. 447 (1992); *United States v. Thomas*, 43 F. App'x 728 (6th Cir. 2002).

B-Line also seeks reversal of the portion of the bankruptcy court's order in which the bankruptcy court expresses its views regarding future filings of proofs of claim. This presents two issues. First, this portion of the bankruptcy court's order is not final. While the concept of finality is applied more flexibly in bankruptcy cases, to be final, an order must dispose of discrete disputes within a larger case. *See Millers Cove Energy Co. v. Moore (In re Millers Cove Energy Co.)*, 128 F.3d 449 (6th Cir. 1977); *In re Dow Corning Corp.*, 86 F.3d 482 (6th Cir. 1996). The portion of the bankruptcy court's order at issue here does not dispose of a discrete dispute within a larger case. In fact, it addresses hypothetical situations which have not yet occurred. As such, it is not final and appealable.

Second, because this portion of the order addresses hypothetical future situations, the appeal seeks an impermissible advisory opinion. B-Line argues that the bankruptcy court is requiring that B-Line comply with Rule 9011 in the future, all purchasers in the claims trading industry obtain and review originating documents, or, in the absence of originating documents, provide an explanation of how the initial obligation occurred and the warranties received in the chain of transfers. Such efforts will, in B-Line's view, "add expense, delay and uncertainty to the claims resolution process."

---

[4]Although the Panel does not address the merits here, the Panel notes that the bankruptcy court engaged in extensive fact-finding before rendering its decision.

B-Line further argues that with these requirements the bankruptcy court has "eliminated the adversarial framework, dramatically increased the cost, and diminished the convenience and fairness of the bankruptcy claims resolution process for B-Line." While B-Line does not object to obtaining documents where B-Line feels that is warranted, it "objects to being subjected to a universal requirement of pulling documents in *every* case where the debt is unscheduled, regardless of the size of the claim, or the presence of a dispute."

Article III of the Constitution prohibits the Panel from considering hypothetical or abstract questions. *Mu Ju Li v. Mukasey*, 515 F.3d 575, 579 (6th Cir. 2008) (citing *United States v. McGee*, 494 F.3d 551, 558 (6th Cir. 2007)). In this portion of the appeal, B-Line is essentially asking the Panel to consider a hypothetical question in future cases, not *this* case, where a debtor has not scheduled a debt and a purchaser in the claims trading industry, not necessarily B-Line, files a proof of claim without reviewing the originating documents. Through B-Line's arguments and objections detailed above, the question essentially becomes: what must a purchaser in the claims trading industry do to comply with Rule 9011 when filing a proof of claim? Answering this question would require the Panel to issue an advisory opinion which it is prohibited from doing by Article III of the Constitution.[5] *Sankyo Corp v. Nakamura Trading Corp.*, 139 F. App'x 648, 650 (6th Cir. 2005) (unpub.).

Finally, the Panel questions whether the bankruptcy court's order in fact sets specific filing requirements for proofs of claim. The Panel reads the language in question as a *recommendation* of best practices–what creditors *ought* but are not necessarily required to do to avoid potential Rule 9011 trouble. At most, the bankruptcy court requires that a creditor provide a "clear explanation" of the source of its claim, which seems nothing more than a restatement of the obvious. Ultimately, it must be remembered that the bankruptcy court engaged in an exhaustive investigation and thorough analysis of the underlying facts and circumstances of B-Lines proof of claim before finding

---

[5] For example, in *United States v. McGee*, the appellant, a criminal defendant convicted of possession with intent to distribute cocaine, argued that the presumption of reasonableness applicable to a sentence within the Sentencing Guidelines range "is not necessarily the appropriate way to review sentences," and asked the Sixth Circuit Court of Appeals "to reconsider its standard of review and to better define what a criminal defendant must do to rebut the presumption of reasonableness." 494 F.3d at 558. The Sixth Circuit found that by "asking the panel to 'better define what a criminal defendant must do to rebut the presumption of reasonableness,"' the appellant was "simply inviting the panel to issue an advisory opinion or to consider hypothetical or abstract questions" which is prohibited by Article III of the Constitution. *Id.*

B-Line in violation of Rule 9011. The Panel finds no reason to believe that the bankruptcy court will do otherwise in other cases in the future.[6]

## V. CONCLUSION

For the foregoing reasons, the appeal is dismissed because it is moot and seeks an impermissible advisory opinion.

---

**6** In the unlikely event that the bankruptcy court were to do otherwise–establish rigid, mechanical filing requirements–the Panel might very well find an abuse of discretion.

MARCIA PHILLIPS PARSONS, Chief Bankruptcy Appellate Panel Judge, dissenting. Because I conclude that this appeal is neither moot nor impermissibly seeks a advisory opinion, and that it presents a dispute ripe for review, I respectfully dissent. Additionally, as discussed below, I respectfully would reverse the order of the bankruptcy court on the merits of this appeal.

As to the ripeness issue, the majority divides the bankruptcy court's order into two parts: the conclusion that B-Line violated Rule 9011 in the instant case and the court's directives regarding the filing of future proofs of claim. According to the majority, the former is final although moot because no sanctions were levied, while the latter is not final and thus not appealable because it addresses hypothetical situations that may or may not occur in the future.

In my view, the bankruptcy court's order is not so readily divisible. Rather than the directives being separate and apart from the bankruptcy court's conclusion that B-Line violated Rule 9011, the directives appear to be a type of nonmonetary sanction imposed because of B-Line's rule violation. *See* Fed. R. Bankr. P. Rule 9011(c)(2) ("Nature of Sanction; Limitations. A sanction imposed for violation of this rule . . . may consist of, or include, *directives of a nonmonetary nature* . . . .") (emphasis supplied); *Stoecklin v. United States*, No. 89-182-CIV-OC-16, 1997 WL 1039239, *3 (M.D. Fla. 1997) (stating that sanctions under Rule 11 can take the form of monetary fines or nonmonetary directives and that in extreme cases, such nonmonetary directives can include a court order barring the offending party from asserting particular claims or defenses); *May v. United States,* 80 Fed. Cl. 442, 449 (Fed. Cl. 2008) (stating that nonmonetary directives are permitted by Rule 11 and ordering that pro se plaintiff must obtain permission of court before filing any future complaint).

The majority implicitly reject this view, stating that the bankruptcy court did not "direct B-Line to take, or refrain from taking, any specific action." According to the majority, the bankruptcy court's discussion was merely "a *recommendation* of best practices–what creditors *ought* but are not necessarily *required* to do to avoid potential Rule 9011 trouble." This conclusion, however, ignores the mandatory language used by the bankruptcy court:

> [T]he court finds that when the debtors have not scheduled any claim listing the originating creditor or any direct or indirect assignee of the originating creditor, ***Rule 9011 requires*** a claim purchaser, before filing a proof of claim with a bankruptcy court, to obtain originating documents or, when such documents are not available,

a clear understanding of the nature of the original dealings that support the assertion of a claim against the particular debtor. Having obtained those documents or that clear understanding, the claim purchaser should then attach to the proof of claim form the originating documents or an affidavit explaining the non-availability of such "media" to the proof of claim form so the debtor and other interested parties are given fair notice of the source and particulars of the claim.

*In re Wingerter*, 376 B.R. 221, 224 (Bankr. N.D. Ohio 2007) (emphasis added).

If originating documents cannot be obtained, and the assignee decides to file a proof of claim notwithstanding the absence of such documents, the assignee ***must*** comply with Rule 3006 [sic] and Official Form 10 by providing a clear explanation (which would include all non-confidential information in the hands of the assignee) of how the initial obligation arose and setting forth the warranties and representations in the chain of transfers that the assignee relies upon in asserting its claim.

*Id*. at 239 (emphasis added). While the bankruptcy court did at times use the more permissive verb "should," it was clear from the court's discussion that the statements were not merely "best practices *recommendations,*" but were instead explicit directives detailing what the court *will require* in the future. As stated by the bankruptcy court:

As a prospective matter, B-Line and other purchasers in the claims trading industry should understand that this Court views the filing, without review of originating documents, of a proof of claim by an assignee/purchaser to fall short of reasonable inquiry under Rule 9011 when the obligation has not been scheduled by the debtors and the purchase of the claim was not accompanied by reliable representations of claim validity.

*Id.* at 238.

Moreover, this language contradicts the majority's conclusion that B-line is not at risk for future sanctions because "the bankruptcy court engaged in an exhaustive investigation . . . before finding B-Line in violation of Rule 9011" and will presumably do so in other cases in the future. To the contrary, rather than indicating that the court will undertake such an exhaustive investigation again, the above-quoted language demonstrates that if B-Line fails in the future to comply with the court's directives, sanctions will be imposed by the court. As such, the bankruptcy court's order was a final order in all respects, subject to review on appeal.

Alternatively, even if the majority is correct that the bankruptcy court's order is, in effect, two orders, one addressing past behavior and the other future, both are reviewable by this Panel. With respect to the portion of the order that pertains to the finding that B-Line violated Rule 9011, the majority maintains that the issue is moot and therefore non-reviewable because no monetary

sanctions were imposed on B-Line. While there is no Sixth Circuit Court of Appeals case directly on point, the First Circuit Court of Appeals addressed a similar situation in *Sterling Consulting Corp. v. Internal Revenue Service (In re Indian Motocycle Co., Inc.)*, 452 F.3d 25 (1st Cir. 2006). In *Indian Motocycle*, protracted bankruptcy litigation between two companies over the rights to the Indian Motocycle trademark and a settlement of that litigation led to a dispute with the IRS regarding respective taxes due from the receivership and bankruptcy estates following the sale of assets. The district court, which had withdrawn the order of reference, was troubled by the IRS's maintenance of inconsistent tax assessments against the parties. The IRS asserted that the inconsistent assessments were necessary to protect itself until final determinations were made regarding total taxes due on the asset sale, a tactic regularly used by the IRS.

Concluding that the IRS had willfully engaged in presenting meritless arguments for purposes of delay, the district court formally declared as a sanction that the IRS's conduct was unacceptable and inappropriate, but did not impose any punishment. *Id*. at 27. The IRS appealed but prior to consideration on appeal, the controversy between the trustee and the IRS settled, bringing the proceedings in the district court to an end. Upon review, the First Circuit Court of Appeals initially questioned whether any injury currently existed that was reviewable. The court answered the question in the affirmative, explaining:

> On appeal, the government has referred briefly to two different interests that its says are impaired or threatened by the sanctions order. One is the IRS's reputation; the other is the risk that the findings of misconduct could be used against it as part of an "unclean hands" defense in related litigation . . . .
>
> Reputational interests can be cognizable; that is what defamation and expungement of record cases are about. But merely to refer to reputation does not in this case denote a concrete threat, as it might if a lawyer were sanctioned and bar discipline was in prospect. . . .
>
> Perhaps, where the conduct of a party (or counsel) is expressly condemned as improper by a formal sanction order, that ought to be enough for review. At least by implication, however, our own case law may be more demanding even in the presence of a formal order. But where a formal order has been entered, we hold that it is sufficient for standing to appeal, and enough to refute any charge of mootness, that the sanction order continues to have potential real-world impact upon the sanctioned party. That test is met in this case.
>
> The conduct condemned by the district court is not some idiosyncratic event; we know (from case law) that the IRS regularly uses [these tactics]. Nor was the district court making a passing negative comment; it formally declared in a sanction

order that the regular practice of the IRS, an institutional litigant, amounts to willful misconduct that invites penalties.

The IRS has a self-evident concrete interest in maintaining practices of this kind. The . . . sanction order is a disincentive for the IRS to repeat its conduct in the same or any sister court; if nothing else, the IRS would have to consider the peril to which doing so would expose its own lawyers. We hold that foreseeable practical consequences give the IRS adequate and justifiable incentive to litigate these appeals and that the government has Article III standing to proceed.

*Id*. at 29-30 (internal footnotes and citations omitted).

Applying these principles to the instant case, the appeal is not moot. B-Line's conduct that the bankruptcy court found sanctionable was not an idiosyncratic event. Rather, it represented the customary business practices of a company whose entire business is purchasing claims against individuals who are debtors in bankruptcy court. Moreover, the bankruptcy court was not making a passing comment, but was issuing a formal ruling that these customary business practices are sanctionable as violations of Rule 9011. Undeniably, the bankruptcy court's order has a real-world impact upon B-Line: if it continues business as normal, the court will almost certainly sanction B-Line again for the very same conduct. On the other hand, if B-Line modifies its practice to address the conduct the court found sanctionable, its cost of doing business, according to B-Line, will be substantially increased Accordingly, I would hold, in the words of the First Circuit Court of Appeals, that "foreseeable practical consequences" give B-Line "adequate and justifiable incentive to litigate" this appeal.

As to the second component of the bankruptcy court's order, the court's directives regarding future filings, the Sixth Circuit Court of Appeals has explained that in determining whether a claim is ripe, an appellate court should examine:

(1) the likelihood that the harm alleged will ever come to pass; (2) whether the factual record is sufficiently developed to allow for adjudication; and, (3) hardship to the parties if judicial review is denied. *Adult Video Ass'n v. United States*, 71 F.3d 563, 568 (6th Cir. 1995). For pre-enforcement challenges, a case is ordinarily ripe for review 'only if the probability of the future event occurring is substantial and of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' *Nat'l Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 284 (6th Cir. 1997) (citations and internal punctuation omitted).

*Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002).

This standard is met here. The likelihood that B-Line will file other proofs of claim is certain given the nature of its business.[1] The factual record is sufficiently developed for review by an appellate court; there is an extensive record with detailed testimony from the parties. Lastly, B-Line faces certain punishment if its proofs of claim fail to have the necessary attachments in cases where the debtors have not scheduled the claims. Therefore, based on the foregoing, I would find that this appeal is ripe for review.

Turning now to the merits of this appeal, I respectfully would reverse the bankruptcy court's conclusion that B-Line violated Rule 9011. In reaching this conclusion, the bankruptcy court used an erroneous legal standard and relied upon a clearly erroneous finding of fact.

With respect to the legal standard, the bankruptcy court held that a claims purchaser must review a debtor's schedules before filing a proof of claim to determine whether the debtor has scheduled a claim that resembles the purchased claim. According to the bankruptcy court, if a debtor has not scheduled a claim, "Rule 9011 requires" a claims purchaser to attach originating documents to its proof of claim. If such documents are not available, the claims purchaser "must" attach to the proof of claim an affidavit explaining the absence and setting forth how the initial claim arose, along with the warranties and representations in the chain of transfers that the purchaser is relying upon in asserting its claim. The court held that this process is necessary to meet Rule 9011's requirement of a reasonable pre-filing inquiry.

While I respect the bankruptcy court's desire to formulate a procedure for the filing of purchased claims, I believe that the process demanded by the court is not required by Rule 9011 and exceeds the court's authority. Rule 9011 provides in pertinent part that:

> By presenting to the court (whether by signing, filing, submitting or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information and belief, formed *after an inquiry reasonable under the circumstances,–*
> . . . .
>
>> (3) the allegations and other factual contentions have evidentiary support or, if specifically identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

---

[1] As the bankruptcy court noted in its opinion, B-Line's business centers on purchasing consumer bankrupt accounts. According to its website, B-Line has purchased and serviced more than $45 billion of bankruptcy receivables since its founding in 1997. *In re Wingerter*, 376 B.R. at 221 n.1.

Fed. R. Bankr. P. 9011(b)(3) (emphasis added). As explained by the Sixth Circuit Court of Appeals in addressing the question of whether an attorney violated Rule 11 by commencing a particular bankruptcy case:

> In this circuit, the test for imposition of Rule 11 sanctions is whether the individual attorney's conduct was reasonable under the circumstances. The relevant inquiry is whether a specific finding was, if not successful, at least well founded. . . .

> The [trial] court, however, is expected to avoid using the wisdom of hindsight and should test the signor's conduct by inquiring what was reasonable to believe at the time the pleading, motion or other paper was submitted. The attorney's conduct must be tested by an objective standard of reasonableness. The determination of whether an attorney conducted "reasonable inquiry" is judged by objective norms of what reasonable attorneys would have done. *Id.* That is, what was reasonable for the attorneys to believe at the time the bankruptcy petition was filed? This of course is a fact-oriented inquiry.

> In determining whether an attorney had or had not conducted a reasonable inquiry, a court undoubtedly should consider a variety of pre-filing factors. In this case, for example, what information about the client's business did the attorneys have? Was the information verified? How involved had these attorneys been in their client's business? For how long? Were other professionals, such as accountants or bankers consulted? What independent investigation, if any, did the attorneys undertake prior to the filing? What did their clients tell them? Were they justified in believing what their clients told them? Did a time problem exist when a decision to file was made? What was the business (and legal) sophistication of the clients and the attorneys? These along with a myriad of other factual details would be crucial to have in hand before determining whether the action taken or not taken by the attorneys prior to filing the bankruptcy petition was or was not reasonable.

*In re Big Rapids Mall Assocs.*, 98 F.3d 926, 930-31 (6th Cir. 1996) (internal citations omitted).

It is clear from this discussion that the "reasonable inquiry" mandated by Rule 9011 turns on a consideration of all the facts present in each particular case. As such, it was erroneous for the bankruptcy court to conclude as a matter of law that a "reasonable inquiry" for a holder of an unscheduled, purchased claim always requires the holder to attach the originating documents to its proof of claim, or set forth in an affidavit attached to the proof of claim an explanation for the documents' absence, a statement of how the claim arose, and all warranties in the chain of title. Granted, Rule 3001(c) and the proof of claim form, Form 10, direct attachment of documentation

of a claim based on a writing.[2]   As interpreted by the courts, such information, along with the other requirements of the rules, is necessary in order for the claim to have prima facie effect under paragraph (f) of Rule 3001.  *See In re Perron*, 350 B.R. 628, 2006 WL 2933827, *5 (B.A.P. 6th Cir. 2006) (unpub. table op.) (holding that creditor's failure to comply with Rule 3001 is not grounds to disallow claim; result of failure to comply is to lose prima facie evidence of validity and amount); *In re Heath*, 331 B.R. 424, 436 (B.A.P. 9th Cir. 2005) (same); *In re Dove-Nation*, 318 B.R. 147, 152 (B.A.P. 8th Cir. 2004) (same). Loss of prima facie effect, however, or even disallowance of a claim for failure to supply this information, is a far cry from the bankruptcy court's holding that the failure to supply this information or explain its absence when the claim is unscheduled is a violation of Rule 9011, sanctionable by the court.[3]

Moreover, I would respectfully reverse the bankruptcy court's conclusion that B-Line violated Rule 9011 in the present case, and would hold to the contrary that B-Line made a reasonable inquiry under the circumstances sufficient to satisfy Rule 9011. The bankruptcy court's primary basis for this holding was that B-Line was asserting a claim that it had purchased from another party, not only without possession of the originating documents, but also without any representation or warranty from the seller as to the validity or enforceability of the claim. This finding, however, is clearly erroneous.

Paragraph 5 of the Purchase Agreement between B-Line and Covenant sets forth the Seller's Representations and Warranties.  In Paragraph 5.7, Covenant as Seller represents and warrants that

---

**2** Rule 3001(c) provides as follows:
(c) Claim based on a writing. When a claim, or an interest in property of the debtor securing the claim, is based on a writing, the original or a duplicate shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim.
Official Bankruptcy Form 10, entitled "Proof of Claim" states at paragraph no. 7:

Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

**3** In reaching this conclusion, I do not intend to suggest that failure to comply with Rule 3001 can never be a *factor* in determining whether Rule 9011 has been violated.  I simply do not agree that failure of a claims purchaser to comply with Rule 3001 is a *per se* violation of Rule 9011 where the debtor has not scheduled the debt in question.

"[a]s of the Closing Date . . . [it] has used reasonable efforts in accordance with industry standards to create Computer Files which set forth each Account designated in the Term Agreement, *each of which meets the Eligibility Requirements as of the Cut-off Date."* (Sealed App. at Tab 1, p. 5.) (emphasis supplied). "Eligibility Requirements" is a term defined under Paragraph 1.14 of the Agreement as "the requirements set forth in Paragraph 9.1 through 9.9 with respect to each Account." (Sealed App. at Tab 1, p. 2.) Paragraph 9.4(ii) provides that "the Account represents a legal, valid and binding obligation of the related Debtor." (Sealed App. at Tab 1, p. 7.) Similarly, Paragraph 9.1(ii) states that "the debt is not disputed by the Debtor or Trustee," while Paragraph 9.1 (iv) provides that "no proof of claim has been or will be rejected or successfully objected to by any person . . . ." (Sealed App. at Tab 1, p. 7.) Thus, there were explicit representations and warranties from Covenant that the accounts purchased by B-Line were valid obligations of the account debtors, including the Debtor herein.

Furthermore, there was no evidence that B-Line's reliance on Covenant's warranties and representations was unreasonable. At the time the proof of claim at issue was filed, B-Line had been purchasing claims from Covenant for nearly two years. Of the 1,017 proofs of claim filed by B-Line as the result of purchases from Covenant, only five, including the claim at issue in this case, had been disputed, with three of the five having been resolved in B-Line's favor.

Additionally, the evidence presented at the hearing in this matter established that Covenant's warranties and representations were based on its own reasonable investigation and prior successful experiences. According to the undisputed evidence presented at the hearing, Covenant had purchased the Debtor's account from Professional Recovery Systems, LLC ("PRS"), a company from whom it had previously purchased valid claims. As a part of its standard business practices, Covenant first inquired into the origin and nature of the purchased accounts. Covenant then employed collection agencies to contact the account debtors, including the Debtor herein, by mail to validate the account and to inform the account debtors that they had 30 days to dispute the account should they wish to do so. Per Covenant's instructions, if the collection agency received a dispute, Covenant would be notified, the file would be temporarily closed, and a determination whether to contest the dispute would be made. Covenant's Chief Executive Officer testified that the account of the Debtor herein had been placed with at least two collection agencies for collection prior to its

sale to B-Line. Notwithstanding the collection efforts by these two agencies, the Debtor never disputed the indebtedness and none of the mail sent by those agencies to the Debtor was returned.

In *In re Cassell*, 254 B.R. 687, 692 (B.A.P. 6th Cir. 2000), this Panel held that a reasonable inquiry for purposes of Rule 9011 may include reliance on the personal knowledge of a third party. *See also Dubois v. United States Dept. of Agric.*, 270 F.3d 77, 82 (1st Cir. 2001) ("signer's obligation personally to comply with the requirements of Rule 11 clearly does not preclude the signer from any reliance on information from other persons"). The bankruptcy court herein rejected B-Line's reliance upon *Cassell* because:

> [N]either B-Line nor Covenant can point to any actor who has personal knowledge that Debtor Gerald Wingerter has an unfulfilled obligation to GTE, nor has B-Line or Covenant produced any custodian for business documents evidencing such an obligation. In the absence of anyone with such personal knowledge or reliable business records, and given that the Debtors did not schedule any obligation relating to GTE, the Court finds that a reasonable inquiry into the facts should have included possession and review of alleged transactional documents between Mr. Wingerter and GTE or some reliable proxy for those documents.

*In re Wingerter*, 376 B.R. at 235-36.

B-Line argues that the bankruptcy court's reference to the failure to produce a custodian for business documents evidencing a claim against the Debtor is misleading and somewhat inaccurate. B-Line indicates that the record shows that two of B-Line's witnesses at the show cause hearing, one from B-Line and one from Covenant, were qualified to authenticate the computer files that contained the claim at issue as ordinary business records of their respective companies. According to B-Line, the procedural posture of the case, a show case hearing initiated by the court rather than an adversary proceeding with opposing counsel, obviated the need or the opportunity for B-Line to lay a foundation for its business records, which it could have readily done if there had been an objection to its business records.

Upon a review of the record, I would attach no significance to B-Line's failure to authenticate its business records since its does not appear that any party challenged the admission of its business records. Further, it is insignificant that neither B-Line nor Covenant was able to identify a actor with "personal knowledge" of the Debtor's alleged obligation. For authentication purposes, "[p]ersonal knowledge is not strictly limited to activities in which the declarant has personally participated. . . . Personal knowledge can come from review of the contents of business records, and [a witness] may

testify to acts that she did not personally observe but which are described in business records." *AT&T Corp. v. Overdrive, Inc.*, No. 1:05CV1904, 2006 WL 3392746, *2 (N.D. Ohio 2006) (internal citations omitted). *See also Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 546 (D. Md. 2007) ("[I]t is not required that the authenticating witness have personal knowledge of the making of a particular exhibit if he or she has personal knowledge of how that type of exhibit is routinely made.") The bankruptcy court's rejection of B-Line's records as "unreliable" simply because it was ultimately established that Debtor did not owe B-Line was based on "hindsight" and a demand for certainty rather than Rule 9011's reasonableness standard. *See Dubois v. United States Dept. of Agric.*, 270 F.3d at 82-83 (Rule 11 does not require absolute certainty); *Kraemer v. Grant County*, 892 F.2d 686, 689 (7th Cir. 1990) (same); *H.J. Rowe, Inc. v. Spiegel, Inc. (In re Talon Holdings, Inc.)*, No. 97 B 37535, 1999 WL 150337, *5 (Bankr. N.D. Ill. 1999) (law does not require standard of perfect knowledge under Rule 9011).

In this regard, it must be noted that in addition to relying on the information it obtained from Covenant, B-Line conducted its own brief investigation. Before purchasing the portfolio of claims containing the Debtor's account, B-Line received a computer file for the account from Covenant which contained the Debtor's name, address, Social Security number, name of the original creditor on the account, original account number, original principal balance, current balance, rate of interest, date the account was opened, date the original creditor charged off the account, date the bankruptcy petition was filed and its case number, the chapter under which it was filed, and the name of the Debtor's counsel. B-Line then reviewed that information for obvious flaws, such as an obviously incorrect Social Security number (i.e., all zero's or nine's or not enough, or too many numbers), or an address which does not exist, and compared it to the electronic records of the bankruptcy court to determine if the data matched. B-Line also searched available electronic databases to determine whether the Debtor had filed any prior bankruptcy cases in which the debt at issue had been discharged.

After completing this process and finding no inconsistencies, B-Line purchased the Debtor's account along with ten others. Subsequent to the purchase, B-Line essentially repeated the above process, and confirmed that the bankruptcy case had not been dismissed, converted from a chapter 13, or that the bar date for filing proofs of claim has passed in the interim. Only then did it prepare and file the proof of claim in question.

The bankruptcy court summarily dismissed these undertakings by B-Line as a focus on "proofreading." While there was certainly a proofreading element to B-Line's actions, they were nonetheless relevant to the reasonableness inquiry because they indicate that B-Line appropriately wanted to ensure that it had the correct individual referenced in the documents obtained from Covenant and that the obligation had not been discharged. When these legitimate steps are combined with B-Line's past successful experience with claims purchased from Covenant, Covenant's activity regarding the account and Covenant's representations and warranties, the conclusion is inescapable that B-Line filed the proof of claim after conducting a reasonable inquiry under the circumstances. *See Glatter v. Mzor (In re Mroz)*, 65 F.3d 1567, 1573 (11th Cir. 1995) (sanctions are warranted where party has absolutely no evidence to support allegations); *Davis v. Carl*, 906 F.2d 533, 536-37 (11th Cir. 1990) (whereas complete lack of evidence may justify sanctions, simply weak evidence will not usually justify sanctions).

The only factual basis in support of the bankruptcy court's conclusion to the contrary was the Debtor's failure to schedule the debt. According to the bankruptcy court, the Debtor's mere failure to schedule the debt at issue was a "red flag" rendering B-Line's reliance unreasonable and demanding further inquiry. *Cf. In re McAllister*, 123 B.R. 393, 396-97 (Bankr. D. Oregon 1991) (Rule 9011 sanctions imposed where Oregon taxing authority filed proof of claim for income taxes allegedly owed by debtor during years where no returns were filed without first determining whether debtor had obligation to pay such taxes; debtor did not list Oregon as creditor on schedules *and* was not an Oregon resident during years in question). However, it is not unusual for debtors to fail to initially schedule a debt, even though such schedules are filed under the penalty of perjury. *See* Steven W. Rhodes, *An Empirical Study of Consumer Bankruptcy Papers*, 73 Am. Bankr. L.J. 653 (Summer 1999) ("[T]he lack of care and understanding of the debtors and attorneys in fulfilling the disclosure requirements [of the bankruptcy schedules and statements] is palpable and disturbing."). As such, when all of the circumstances of this case are considered, the Debtor's failure to schedule the debt did not, in and of itself, render B-Line's otherwise reasonable inquiry unreasonable. Based on the foregoing, I would respectfully reverse as clearly erroneous the bankruptcy court's holding that B-Line violated Rule 9011 by failing to conduct a reasonable pre-filing inquiry.